ROBERT OSBORNE and others *vs.* KNIFE FALLS BOOM CORPORATION and another.

November 21, 1884.

Navigable River — Power of Legislature to authorize Company to Maintain Booms and Collect Boomage.—It is assumed in this case that the St. Louis is a navigable river of the United States, and as such protected by our congressional enabling act, and by the constitution and laws of this state, which make rivers of that character common highways and forever free, as well to the inhabitants of Minnesota as to all other citizens of the United States, without any tax, duty, impost, or toll therefor. It appears that the navigability of the river in those parts of it obstructed by defendants' works complained of by plaintiffs and hereafter

mentioned, is a mere floatability for loose logs, so that the practical questions presented by the case relate solely to the rights of the plaintiffs to the use of the river in those parts for the purpose of floating loose logs. *Held*, that the act of the legislature (Sp. Laws 1872, *c.* 106 as amended by Sp. Laws 1878, *c.* 73,) which authorizes and requires the Knife Falls. Boom Corporation, within certain limits, to construct and maintain booms in said river, and to receive and take the entire control of all logs and lumber coming within such limits, and boom, scale, and deliver them to the proper owners upon reasonable request,—those required to be delivered above Knife Falls to be delivered as directed by the surveyor general, and those required to be turned over Knife Falls to be so turned over, such turning over being as to them the only delivery required, said act also authorizing said company to charge and collect boomage on the logs so turned over, as well as on those delivered above Knife Falls,—is valid, and not in violation of our enabling act or state constitution, notwithstanding the works of defendants erected and operated under the act materially interfere with and interrupt the use of the river for floating logs therein over said falls, and seriously delay the logs of those attempting and desiring to use it in that way.

Same—Remedy for Insufficient Booms and Excessive Charges.—The trial court finds that the capacity of defendants' works constructed and operated under the act can be increased without unreasonable expense, so as to reduce the delay and interruption mentioned, though as much or more will always depend upon the proper manning and operating of the works as upon their construction and capacity. *Held*, that if the act under which defendants are proceeding, though within the scope of legislative authority, is imperfect or defective in details, or for want of details, if it operates unfairly or allows excessive charges, further legislation may be applied for, and, if the application is reasonable, it is to be presumed that it will be granted.

Same—Remedy by Forfeiture of Charter or Action for Special Damages—Injunction Refused.—*Held, further*, that if defendants neglect or refuse to perform any duty cast upon them by the act, they may be proceeded against for a forfeiture of franchises; or if any one suffers special injury from such misconduct, he has his action for damages; but that none of these grounds of complaint entitle plaintiffs to an injunction against the maintenance and operation of defendants' works under the act aforesaid.

The plaintiffs, who are owners of pine lands upon the St. Louis river and its tributaries above Knife Falls, brought this action in the

district court for Carlton county, against the Knife Falls Boom Corporation and the St. Louis River Boom & Improvement Company, to restrain the defendants from hindering or delaying the passage of plaintiffs' logs down the river, and to require the defendants to remove from the river their piers and structures erected therein, so as to give a free and unobstructed passage to the plaintiffs' logs; or that the defendants be required to so alter and reconstruct their boom and works as to enable them to separate from plaintiffs' logs such as are to stop at Knife Falls, and allow plaintiffs' logs to pass on whenever and while the water in said river is sufficient to take them over said rapids, and before the water becomes too low for such purpose, and so as not to delay or increase the expense of the plaintiffs in getting their logs to Duluth or over the rapids.

The action was tried before *Stearns,* J., who, having found the facts as stated in the opinion, ordered judgment for the defendants, which was entered, and the plaintiffs appealed.

*J. M. Gilman, Gordon E. Cole* and *W. W. Billson,* for appellants.
*Warner & Stevens* and *J. N. Castle,* for respondents.

BERRY, J.   Facts as follows are found by the court which tried this action below:   The St. Louis river rises in this state and flows over 200 miles therein, forms the boundary between it and Wisconsin for about 20 miles, and then empties into Lake Superior.   Upon it and its tributaries, and in the region drained thereby, lie extensive pine forests, large tracts of which, situate above the obstructions maintained by defendants in the river, as hereinafter stated, are owned by plaintiffs.   This river furnishes the only practicable route by which the logs and lumber of these forests can be transported to market. Ever since its acquisition by the United States this river has been a public highway, navigable by steam-boats for 20 miles from its mouth, and for 200 miles above for row-boats, canoes, and bateaux, with the exception of two portages, one from Fond du Lac to Thompson, a distance by river of about nine miles, and the other around Knife Falls. In its natural state the river was of such capacity and character as to render it practicable to float loose logs and timber from near its source to its mouth during periods of ordinary high water, and for this purpose it was a valuable highway.   From Thompson to Fond du Lac

the river "flows down a series of cascades and rocky rapids, over which, in its natural state, logs and timber would float in a rising stage of high water; and, though the rapids have been improved for the running of logs by the building of dams and the blasting out of rocks, still, to run them successfully, logs must be allowed to reach them on a high or rising stage of water, otherwise they will be hung up on the rocks." There are 12 saw-mills at and near Duluth, of large capacity, and the plaintiffs, owning pine lands as aforesaid, desire to float logs cut thereon down the river to said mills for manufacture or sale, and any obstruction to such floating renders the lands and timber of plaintiffs less valuable, and inflicts upon them "a special injury not common to the public generally."

By the terms of Sp. Laws 1872, *c.* 106, the defendant the Knife Falls Boom Corporation (under license from which the other defendant, the St. Louis River Boom & Improvement Company, has proceeded) is authorized and required to construct, maintain, and keep in reasonable repair such booms in and upon the St. Louis river, within townships 49 and 50 of range 17, in Carlton county, (being the townships within which are the obstructions complained of in this action,) at such points as it may deem advisable and sufficient to secure, receive, scale, and deliver all logs that may, from time to time, come or be driven within said limits, and to receive and take the entire control and possession of all logs and timber which may be run, come, or be driven within the same, and boom, scale, and deliver them as hereafter provided. Section 3 of the chapter provides that all logs and lumber coming within the limits aforesaid, before delivery thereof to the owners, shall be scaled by the surveyor general; the expense of the scaling, not exceeding two cents per thousand feet, to be paid by said Knife Falls company. Scale bills of each separate mark are to be made out by the surveyor general, as logs are required to be delivered, and, when so assorted and scaled, secured in strings, brails, or otherwise, as the surveyor general may deem proper, they are to be delivered to the proper owner, upon reasonable request, upon paying to said company the amount of boomage and other charges authorized by the act. By section 4, as amended by Sp. Laws 1878, *c.* 73, the company is entitled to compensation for boomage (which in-

cludes scaling, assorting, and delivery of logs) at a rate not exceeding 45 cents per thousand feet for the first five years, and until the legislature shall alter or change the same, to be computed from the scale bill required to be made by the surveyor general; and, by the same section, all logs required by the owners thereof to be turned over the Knife Falls below the boom, shall be turned over by said company upon payment by the owners thereof of the above-named compensation per thousand feet, and no additional charge shall be made therefor. By section 5 the compensation to which the company is entitled becomes due whenever the logs are scaled and ready for delivery, and a lien is given to the company upon enough of the same to pay their lawful charges.

Beginning in 1880, the defendants have constructed piers and booms across the entire width of the St. Louis river, within the limits mentioned, by means of which they stop and hold all logs and timber floating down said river to the places where the piers and booms are situated. The defendants have also constructed, in connection with the piers and booms, assorting booms and gaps, to facilitate the assorting of logs so stopped, and the delivery of logs destined to mills within said limits to the owners thereof, and the turning of logs destined for points on the river below said limits loose in the river below said works; and such assorting works require all logs passing down the river to pass through an opening about 27 feet wide. The general plan of the assorting works is such as is in quite common use throughout the lumbering regions of the Northwest for like purposes, and no better is suggested. The capacity of the works for the rapid assorting and delivery of logs can be largely increased without altering the general plan, and without unreasonable expense, by extending the assorting booms, and widening the upper portion of the passage-way to 40 feet in width, or by making two passage-ways, or by both means; but as much or more will always depend upon the proper manning and operating the works as upon their construction and capacity.

It is not practicable to construct and operate any booms or assorting works on the St. Louis river within the limits mentioned, through which any considerable quantity of logs can be passed—and assorted

as they pass—without material hindrance and delay to logs destined to points below such limits; and, if logs have to be scaled during their passage through the works, the hindrance and delay must be much greater.   No boom or other obstruction in the St. Louis, within the limits mentioned, can be of any aid, service, or assistance to the plaintiffs, or others, who desire to run their logs to any point below such limits; but such boom or other obstruction will, under any and all ordinary circumstances, operate as a detriment so far as they delay logs in reaching their destination; and such delay is likely to be serious and considerable, because logs will usually reach such works in high water, which seldom lasts in the St. Louis for more than one to three weeks; and, if logs are detained in the booms until a falling stage of water occurs, they will not pass over the rapids until another rise, and a rise does not ordinarily occur more than twice a year.   It is not practicable to raft logs on the St. Louis river above the limits mentioned, or to float rafts through the limits, or along the river below the same above Fond du Lac, and there is no opening left in defendants' works for the passage of either rafts or boats; and the booming, scaling, assorting, and delivering of logs mentioned in the fourth section of the act aforesaid are of no benefit or advantage to the owners of logs destined to points at or below Fond du Lac.   Some of the plaintiffs, during 1882 and 1883, cut logs on the St. Louis and its tributaries above defendants' booms, and endeavored to float them to Duluth, but succeeded in getting only a small part through, the detention at defendants' booms and the unusually low water in the St. Louis during these years having "each supplemented the other in delaying said logs."

Within the limits mentioned there are certain rapids, out of which defendants have blasted· and removed rock, thereby making a better channel for the passage of logs, but it was entirely feasible and practicable to float logs over them in their natural state.   The defendants claim the right to charge, and do charge and collect, and threaten to charge and collect, by detention and sale of logs, 45 cents per thousand feet for all logs passing their works, whether assorted and delivered to their owner, or allowed to pass down the river in a common mass without being assorted and delivered to their several owners;

v.32—27

and the plaintiffs and others are deterred thereby, and by the hindrance and delay occasioned by defendants' booms and piers, from cutting and floating to Duluth large quantities of logs, as they otherwise would do.

The special relief demanded by plaintiffs is that defendants be restrained from stopping, hindering, or delaying the passage of plaintiffs' logs down the river, and that they be required to remove the piers and other structures erected by them in the river, so as to give a free and unobstructed passage to the plaintiffs' logs, or that they be required so to alter their works as to enable them to separate from plaintiffs' logs such as are to stop at Knife Falls, and allow plaintiffs' logs to pass on whenever and while the water in the river is sufficient to take them over the rapids, and before it becomes too low for that purpose, and so as not to delay the plaintiffs in getting their logs to Duluth over said rapids, or to increase the expense thereof.

As a conclusion of law the trial court found that plaintiffs were not entitled to the relief demanded, but that defendants were entitled to judgment against plaintiffs for costs.

While, in our view of the law of this case, some portion of the foregoing findings may not be necessary to the proper consideration and determination of the substantial questions involved, we have thought best to present them, in order that it might fully appear what state of facts was before us.

It may be conceded in this case, as it was by Mr. Justice Miller, speaking for the federal supreme court, in *Pound* v. *Turck*, 95 U. S. 459, 462, in reference to the Chippewa river, that the St. Louis is a "navigable river of the United States," and as such protected by our congressional enabling act, and by the constitution and laws of this state, which make rivers of that character "common highways, and forever free, as well to the inhabitants of said state" (of Minnesota) "as to all other citizens of the United States, without any tax, duty, impost, or toll therefor." But the findings of the trial court show that its navigability in those parts obstructed by defendants' works, is, in fact, a navigability, or, more properly, a mere floatability, for loose logs only. As respects the navigation of the river, the plaintiffs'

·only complaint is that their loose logs are detained by defendants' works. The case is then wholly disembarrassed of any difficulties which might present themselves if the river was navigable in the ordinary extended sense,—that is, for vessels and rafts,—and the complaint was of the interruption of that sort of navigation. The practical questions before us relate solely to the rights of the plaintiffs to the use of the river for the purpose of floating loose logs.

Where a stream, as the St. Louis, is of such a character that logs ·can only be floated in it loose, the logs of different owners will unavoidably become intermingled. This intermingling is inseparable from the use of the stream. The right to float logs in a stream of ·course implies the right to take them out; and when the logs of different owners, A, B, and C, are thus intermingled, there appears to be no practicable way for A to separate his from B's and C's, in order to take them out, except by stopping the whole mass. If this cannot be done, then A's right of floatage is of little or no value. Yet A's right to use the common highway is equal to that of B or C, and if his interest requires that his logs should be taken out at a point above the places where B's or C's interest requires that theirs should be ·taken out, respectively, he must have a reasonable right to stop the mass for that purpose; a reasonable right—that is to say, a right reasonable as between him and B and C, and others using the river for like purposes. *Watts* v. *Tittabawassee Boom Co.,* 52 Mich. 203.

Now it appears that there is a large number of persons (there are 14 plaintiffs in this case) owning standing timber upon the upper waters of the St. Louis and upon its tributaries, who must float their logs to market down the St. Louis, some to Fond du Lac, Duluth, or Superior, and some to Cloquet, or other points above and near Knife River Falls. The interest of the latter requires that their logs should ·be stopped before passing Knife River Falls; the interest of the former, that their logs should be allowed to run over them without interruption. In this conflict, who is to determine how the right of floatage upon this common highway shall be enjoyed? Who is to fix upon the just and proper compromise of these conflicting interests? Obviously, the legislature,—that department of government which, in

the exercise of a law-making and a police power, prescribes the rules by which the use of public highways in general is regulated, (*Pound* v. *Turck, supra; Watts* v. *Tittabawassee Boom Co., supra;*) and save as controlled by paramount law—that is to say, in this instance, by our state constitution or enabling act—the discretion of the legislature in the premises is practically unlimited. It may enact laws prescribing the manner in which the common right of floatage shall be enjoyed. It may determine what means shall be adopted, and by what agency, to secure results which, in its judgment, are the best and fairest practical compromises of conflicting interests,—the best attainable good of all concerned. *Pound* v. *Turck, supra; Duluth Lumber Co.* v. *St. Louis Boom Co.*, 17 Fed. Rep. 419. In the exercise of its legislative discretion, it may authorize suitable means and instrumentalities to secure this end to be provided and employed by a private person or by a corporation, and it may prescribe what these means and instrumentalities may be,—as booms, dams, piers, sluiceways,—and what use may be made of them, and, in general, in what manner the business shall be conducted. *Stevens Point Boom Co.* v. *Reilly,* 44 Wis. 295; *Benjamin* v. *Manistee River Imp. Co.*, 42 Mich. 628; *Wisconsin River Imp. Co.* v. *Manson*, 43 Wis. 255.

But it is contended that the legislature is prohibited by our enabling act and state constitution from interfering or authorizing interference with the free and unobstructed navigation of the St. Louis river. Conceding, as we have, that the enabling act and the constitution are applicable to the St. Louis river, they provide in substance that it shall be a "common highway, and forever free, * * * without any tax, duty, impost, or toll therefor." Keeping constantly in mind the capital fact that the present controversy relates solely to the floating of loose logs, (the only kind of navigation of which the stream is susceptible,) let us see what the legislature has attempted to do; premising, at the outset, that the presumption in favor of the validity of legislation requires us to assume that if the legislature had the power to pass the special act under which defendants justify, the state of facts before it was such as to warrant its particular provisions. Referring to our previous abstract, and to the act itself, for details, it is enough to say here that those parts of the act which

concern the present controversy, in their general scope and effect, authorize and require the Knife Falls Boom Corporation to provide booms within specified limits, including Knife Falls, to receive and take the entire control of all logs and timber coming within the limits, and to boom, scale and deliver them to the proper owners, upon reasonable request,—those required to be delivered above Knife Falls to be delivered in strings, brails, or otherwise, as directed by the surveyor general, and those required to be turned over Knife Falls to be so turned over; such turning over being as to them the only delivery required.   Of the provisions as to boomage we will speak hereafter.

Now the effect of all this is to constitute the Knife Falls Boom Company a public agent, a *quasi* public corporation, (like a railway company,) a representative of the state charged with the functions of (so to speak) administering the navigation or floatage of the St. Louis river within certain limits, and of controlling and directing the use of the river for the common advantage, and with reference to the common necessity, of those concerned in floating logs thereon.  *Cohn v. Wausau Boom Co.* 47 Wis. 314.   Notwithstanding this control, the river remains a *common* highway; any person who desires can float his logs in it.   If the enabling act and our constitution use the words *"forever free* as well to the inhabitants of said state as to all other citizens of the United States" as meaning that such inhabitants and citizens cannot be deprived of the use of the river, (which would appear to be about the same as making it a common highway,) the act under consideration does not deprive them of such use or attempt to do so.   What is done is not to deprive them of the use of the river, or exclude them from the common highway, but to regulate the use of the same for the common benefit.   The act does not assume to declare that any person shall not use the river, but regulates the *manner* of use according to what the legislature in its discretion has regarded as the necessity of the case.   The legislature is to be credited with the presumption that this will, on the whole, facilitate the use of the river, and, in a just as well as authorized sense, *improve* it, for the purpose of floating logs.

The provision allowing boomage charges is not an infringement of that portion of the enabling act and of our state constitution which

declares that the river shall be "forever free,   *   *   *   without any tax, duty, impost, or toll therefor." Taking the words "forever free," and the words "without any tax, duty, impost, or toll therefor," to be equivalent, then the act does not disregard the enabling act or our constitution. The boomage is not charged for the use of the river, but to compensate the defendants for their outlay in erecting and maintaining the works which the legislature has deemed proper to facilitate the common use of the stream, and which it has therefore authorized, as also to compensate them for such care and control as it is their duty to exercise over the logs coming within their chartered limits. The defendants' works are *improvements of and aids to* the navigation of the river, viz., its use for floating loose logs. This doctrine is held in *Cotton* v. *Miss. & Rum River Boom Co.*, 22 Minn. 372; *Weaver* v. *Miss. & Rum River Boom Co.*, 28 Minn. 534; *Stevens Point Boom Co.* v. *Reilly, supra; Cohn* v. *Wausau Boom Co., supra; Watts* v. *Tittabawassee Boom Co., supra; Duluth Lumber Co.* v. *St. Louis Boom Co., supra; Pound* v. *Turck, supra; Black River Imp. Co.* v. *La Crosse B. & T. Co.*, 54 Wis. 659; and the doctrine that tolls may be charged on account of such improvements without infringing upon the freedom of the river is upheld in *Benjamin* v. *Manistee River Imp. Co., supra; Duluth Lumber Co.* v. *St. Louis Boom Co., supra; Nelson* v. *Sheboygan Slack-Water Nav. Co.*, 44 Mich. 7; *Manistee River Imp. Co.* v. *Sands*, 19 N. W. Rep. (Mich.) 199; Cooley, Const. Lim., *592; Gould on Waters, § 143.

The plaintiffs contend that they should not be compelled to pay boomage, because they derive no benefit from defendants' works; that as to them such works are not improvements facilitating the use of the river. And the trial court finds that no boom or booms, or other obstructions, in the St. Louis, within the limits mentioned in the act, can be of any aid, service, or assistance to the plaintiffs, or others, who desire to run their logs to any point below such limits; but will, under any and all ordinary circumstances, operate as a detriment by delaying their logs. It may be true that if the plaintiffs could have the exclusive use of the river, their logs would reach them with less delay than the defendants' works will permit. In such circumstances it would be true that the works would be of no advantage

to plaintiffs, but the contrary. But the river is a *common highway*, and the plaintiffs are not entitled to its exclusive use. It can only be used for floating loose logs. That is the way in which plaintiffs use and propose to use it. The result is that their logs are necessarily intermingled with those of other persons desiring to avail themselves of the common highway. As respects the right to use the river, the parties stand on the same footing. Unless the mass of intermingled logs can be stopped at the proper place, so as to enable those whose interest demands it to separate their logs from the mass, they are virtually deprived of the use of the river, and, in fact, none can use it to advantage except those whose logs are to be run to the end of the river. On the other hand, it is for the plaintiffs' interest that their logs should run on without stoppage or delay. In this conflict of interest the defendants' works are intended by the legislature to render practicable the enjoyment of the common right of navigation; to reconcile, as far as may be, the exercise of somewhat inconsistent rights to the use of the river; in a word, to enable all to float their logs loose and intermingled, as they must do, and at the same time preserve and secure the reasonable rights of all.

On the whole, this is an improvement of the river for the benefit of all concerned in its use, and one for which it is therefore competent for the legislature to require those using the river to make compensation. The fact that in a particular instance the works may be of no advantage to a particular person, or that he would be better off without them, does not affect this general proposition. If a lock, by which slack-water navigation of a public river is secured so that it can be ascended with greater facility, is of no advantage to one simply desiring to descend the river, it would not be contended that it was improper or incompetent to require such person to pay for using the lock which had been authorized and constructed for the general benefit—the advantage of the public on the whole. This illustration, as well as that drawn from the operation of the pilot laws by Mr. Justice Miller in *Duluth Lumber Co.* v. *St. Louis Boom Co.*, *supra*, is in point in the case which might be presented, if, at a given time, no logs were running in the St. Louis except such as were destined to points below defendants' works. Notwithstanding a particular in-

stance might present this state of facts, yet, in accordance with what the legislature, in its wisdom, has deemed to be the general good, the defendants' works must be maintained, and the defendants must be prepared to perform the duties enjoined upon them, and for the expense of doing these things it is competent for the legislature to provide that they shall be reimbursed.

It is, perhaps, possible that there might be legislation (similar to that involved in this case) so outrageously and palpably extreme as to justify a court in pronouncing it in excess of legislative authority; but this state of things is not to be presumed; and though the act under consideration may be imperfect and susceptible of improvement, we discover in it no evidence of such excess of legislative authority.

From what we have said it follows that, in our opinion, the special act under which the defendants justify is valid, and that it authorizes defendants to take charge and control of plaintiffs' logs, and to charge boomage accordingly. Very similar legislation appears to have been had in other instances in this state, and in Michigan and Wisconsin, where it has borne the test of judicial investigation.

This disposes of the principal questions in the case. One or two minor points remain. The trial court finds that the capacity of the defendants' works can be enlarged without any change in their general plan, and without unreasonable expense, by extending the booms and enlarging or doubling the passage-way, but adds that as much or more will always depend upon the proper manning and operating the works as upon their construction and capacity. If the act under which defendants are proceeding, though within the scope of legislative authority, is imperfect or defective in its details, or for want of details; if it operates unfairly, or if the charges which it allows are excessive,—further legislation may be applied for; and if the application is shown to be just and reasonable, we are to presume that it will be granted. *State* v. *Iron Cliffs Co.*, 20 N. W. Rep. (Mich.) 493. If defendants neglect or refuse to perform any duty cast upon them by the act, they may be proceeded against for a forfeiture of franchises; or if any one suffers special injuries from such misconduct, he has his action for damages. *Black River Imp. Co.* v. *La Crosse B. &*

*T. Co., supra; Cohn* v. *Wausau Boom Co., supra.*   But we do not think that any of these grounds of complaint entitle the plaintiffs to the injunction prayed for.   It is to be remembered that the defendants are charged with functions of a public nature.   The public, and private persons other than plaintiffs, have an interest in the maintenance and operation of defendants' works, and, in such circumstances, an injunction, to be allowed at all, should be allowed at the suit of the state.   This is all that we deem it necessary to say in this case, except to add that, while following the example of the supreme court of the United States, in *Pound* v. *Turck,* we have in plaintiffs' favor conceded the application of our enabling act and state constitution to the St. Louis river, we are not to be understood as so deciding.

Judgment affirmed.