St. Louis Dalles Improvement Company *vs.* C. N. Nelson Lumber Company.

April 8, 1890.

**Boom Company—Special Law held Sufficiently Definite.**—The special law authorizing the plaintiff to improve the navigability of a specified part of the St. Louis river, to assume control of logs driven down the river, and to charge specified tolls, *held* not to be so uncertain or indefinite as to be ineffectual.

**Same—For what Logs Tolls may be Charged.**—*Held*, that the statutory obligation to assume control of, and to drive through the specified limits, "all logs that may be *driven* down" said river, and to charge tolls therefor, is applicable to logs retained in booms above this locality, and not intended to be floated further down the stream, but which accidently escaped from the boom, and were carried down in a great freshet.

Plaintiff brought this action in the district court for St. Louis county to recover tolls to the amount of $17,000. The action was tried in Ramsey county, before *Vilas*, J., who ordered a dismissal at the close of plaintiff's case. After his decease a motion for a new trial was made before *Kelly*, J., and was denied, and the plaintiff appealed.

*J. M. Gilman, H. J. Horn,* and *W. W. Billson,* for appellant.

*Warner & Lawrence* and *White & Reynolds,* for respondent.

Dickinson, J. In June, 1888, the defendant owned a very large quantity of saw-logs, which had been floated down the St. Louis river and within the booms of the Knife Falls Boom Corporation, above Knife Falls, where the defendant intended to retain them to be manufactured into lumber. By reason of a great freshet and an extraordinary high stage of water in the river, the logs were swept out of the boom, and down the stream, to and through that part of the river where the plaintiff had made improvements to overcome the natural obstacles to the floating of logs. The plaintiff claims the right to charge tolls for the logs so carried down through that part of the river where its improvements are situated. This action is for

the recovery of such tolls according to the special law hereafter referred to.

The plaintiff corporation was organized, under the general laws of the state, in 1874. The purpose of its organization, as set forth in its articles of association, was "the building of slack-water navigation upon, and improving the navigability of, the St. Louis river, between, [here follows a designation of a certain part of the stream, embracing some 13 miles of its course,] by blasting rocks, removing obstructions, and building dams and such other structures and works of internal improvement as will facilitate the running of logs, and otherwise improve the said river." Chapter 48 of the Special Laws of 1875, after reciting the formation of this corporation "for the purpose of improving the navigability of the St. Louis river" within the limits specified, enacts, in section 1, that the corporation shall have the term of three years "to finish and perfect its improvement" of the river within those limits, "to make the said river, between the said points, navigable for the purpose of driving and floating down the said river any and all pine saw-logs cut upon the said river above and between the points above mentioned, * * * and for such purpose shall have full power * * * to build and construct dams and wing-dams upon the said river, and by removing obstructions within the bed of said river, and to raise the water upon the said river, and to divert the current thereof." Section 2 provides that at the expiration of the three years specified the corporation "shall take and receive all logs that may be driven down the said St. Louis river" at the upper limit of the section of the stream before designated, "and shall drive the said logs down the said stream until and below" the lower limit of that section of the stream; "but no logs required for manufacturing or other purposes within the points designated shall be subject to the provisions of this act;" it being further provided that as to such logs the owners should give notice to the corporation before they should come within its limits, and should also separate them from other logs in the river. Section 3 allows the plaintiff to receive and collect, "for the services rendered under the provision of section 2 of this act," a specified toll for the logs "so received and driven by the said corporation between the

points aforesaid." By subsequent legislation the rate of toll was modified, and the time for making the improvements was extended. At the close of the plaintiff's case the court dismissed the action. We are to consider whether the plaintiff had shown a right of recovery. It will be convenient to hereafter refer to this part of the stream where the plaintiff's improvements were made as the plaintiff's "limits" or the plaintiff's "territory."

It is claimed on the part of the defendant that what is prescribed to be done by the plaintiff corporation as a condition of its right to charge tolls, is so indefinite and uncertain that the grant is ineffectual. It is to be admitted that the right to charge tolls for the use of the stream could not have been conferred by the legislature, except upon the condition that the plaintiff should make such improvements to facilitate that use as, in the estimation of the legislature, should be a general public benefit, and a proper and adequate consideration for the granting of such right. While it may be true that, from the nature of the case, the legislature could not well determine, and embody in its enactment, precisely what should be done by the corporation, it was possible to make more definite provision upon the subject than was done,—to provide a means for determining what was to be done, and whether it had been done. But, while the law, in the terms which we have recited, may have been one of questionable expediency, it is our duty to give effect to it, if it is reasonably susceptible of a construction which will render its observance and enforcement legally practicable. We think that a definite meaning and effect may be given to it. Obviously the corporation was not intended by this act to be allowed to do as much or as little as it might elect to do for the improvement of the stream, and then to charge tolls, even though the obstructions to navigation should remain practically and substantially as before. Upon such a construction, the act could not be sustained. We think that the law, read in connection with the charter of the corporation, to which it evidently refers, must be regarded as contemplating the making of improvements of the kind specified, to such an extent as to render the stream, within these limits, reasonably navigable for logging purposes. If this were done, since the corporation itself was required to take charge of all logs,

and to conduct them through its limits, it would not so much concern the owners, practically, whether or not everything should be done which might facilitate the management and floating of logs.  Of course, the plaintiff accepting its franchise in this form, it was left open to issue and proof as to whether it had complied with the conditions upon which its right to charge tolls must be deemed to rest; for the legislature has not determined it, nor provided any special means for its determination.

There was evidence in the case tending to show that the plaintiff had done what the act of the legislature contemplated, and that the improvements made by the plaintiff had been maintained by it, and were in proper condition to serve the purposes intended, when the logs in question were swept through there, in June, 1888.   The decision of the learned judge of the district court, refusing a new trial, was placed upon the ground that, as these logs were not intended by the owners to be floated down this part of the river, and were not "driven" into the plaintiff's limits by any act or with the consent of the owners, but only by accident and by force of the freshet, the statutory right to charge tolls was inapplicable.   We have been led to a contrary conclusion, although we recognize the force of the reasons influencing the decision of the court below.   We also understand that the right to exact such tolls cannot be recognized as existing unless the intention to grant the right is found expressed in the legislative act, reasonably and fairly construed.   The language of the act subjecting to tolls all logs "driven" down the river is susceptible of a broader meaning, as well as of the narrow one signifying a personal control and management of the logs.   Indeed, we suppose it to be true that generally, in this mode of transporting logs, on streams of any considerable size, the great mass of the logs is swept down with the current, without any personal control being exerted upon them; and it is suggested by the evidence in this case that the manner of doing such business is to allow the stream to carry down, without personal attendance, all logs that will float to their destination by the unaided action of the water; the drivers then commencing at the upper end of the course, and bestowing such labor as may be necessary to refloat such logs as may have become

stranded on the way. There can be no doubt that in such a case the term "driven," within the meaning of this legislative act, would be applicable to the logs which should come down, unattended, in advance of those upon which personal labor had been bestowed in the course of the passage; and, if the stage of water or the course of the stream were such that no such labor should be necessary to keep the logs in the current, the logs sent down in that manner would be deemed to have been "driven" down the stream, within the meaning of the act. Or, if a log-owner should put his logs into the stream, above the limits of the plaintiff's improvements, to be floated down to a point below this territory, but should neglect, or for any cause be prevented from, putting on a force of men to follow them down the stream, the logs thus coming within the limits, and under the care and control, of the plaintiff, and floated down through its territory, would be subject to toll as logs driven down the stream. We consider that the word "driven" should be construed as properly including logs driven only by the unaided action of the stream. This is a proper meaning of the word in our language. See Webster's Dictionary.

That these logs were not originally intended by the owners to go below the Knife Falls boom, a short distance above the plaintiff's limits, and that in this particular case the floating of the logs through these limits may have been of no benefit to the defendant, we do not regard as matters of controlling importance in the construction of the law. The right to charge tolls does not depend upon the improvement or service having been actually beneficial to the owner in the particular instance. *Osborne* v. *Knife Falls Boom Co.,* 32 Minn. 412, (21 N. W. Rep. 704;) *Osborne* v. *C. N. Nelson Lumber Co.,* 33 Minn. 285, (22 N. W. Rep. 540;) *Chesley* v. *De Graff,* 35 Minn. 415, (29 N. W. Rep. 167.) The act to be construed was not adopted with reference to this particular case, but was in the nature of a law to have a general application; and we should read the law with regard to such general considerations as the legislature must have contemplated in adopting it.

Without reference to the evidence in this case showing the serious obstructions existing in the stream at the time this act was passed,

it is to be assumed that the legislature deemed them to be so great as to justify the means adopted, and embodied in this act, to overcome the difficulties, and to make the stream practically useful for floating logs. It is to be assumed, too, that the legislature considered that, even though in some particular cases the improvements and service of the plaintiff might be of no benefit to persons affected by the act, yet that in general the result would be beneficial. It is further to be observed that although one having logs above these limits might desire to retain them there, yet, if they should escape, and be carried into this part of the stream, it might be considered to be for his advantage that they should be carried down to open water below, rather than that they should be obstructed, and perhaps become jammed in an inextricable mass in the chain of natural obstructions in this part of the river. There is, then, nothing in the nature of such cases to render it improbable that the law was intended to have an application so general as to include them. Again, it is to be considered that not only the owners of these logs, but the public, were concerned in the matter under consideration. This stream was a public highway, the general usefulness of which depended upon its being kept free from obstructions; and this may be deemed to have been one of the purposes in view in the adoption of this law. Whether or not it might be for the interest of a particular log-owner that his logs, although carried down the stream by accident, should be allowed to lodge within these limits, and become jammed so as to obstruct the further use of the stream, it was for the general interest of the public that this should not occur. Reading the law in view of these considerations, it would seem that the provision requiring the plaintiff to assume control of all logs driven down the river and into its territory, and to drive them through this section of the stream, should not be construed as being inapplicable to logs coming down under such circumstances as are presented in this case. So far as concerned the public interest, it would be a matter of little moment what might be the wishes of the log-owner in a particular case. Indeed, it would seem, from the terms of the act, that it was not contemplated that in general the plaintiff would be informed concerning the wishes of the owners of logs. Specific pro-

vision is made for notice as to logs which might be desired to be retained *within* these limits for manufacturing or other purposes.    No other provision is made respecting notice, and no duty to give notice in general is to be inferred, in view of the explicit provision as to notice in the one case specified.    As we have before remarked, those logs in a "drive" which would first come down would ordinarily be unattended by drivers, but would come into these limits, as the logs in question did, floating by the unaided action of the stream.    Yet the act requires the plaintiff to assume control of "*all* logs that may be driven down the said St. Louis river," and to drive them through these limits.    This is an obligation imposed upon the plaintiff which it cannot neglect to perform without rendering itself liable in damages; at least in the absence of some notice affecting the obligation.    Hence, it seems apparent that the law made it practically necessary for the plaintiff to assume the control of, and to drive, all logs found coming down the river, and within its limits.    It is not to be supposed that the mere undisclosed desire of the log-owners, under such circumstances, should control the conduct of the plaintiff, or affect its duty as prescribed by statute.    Were it not for the use of the word "driven," concerning which we have commented, the terms of the act, and the considerations to which we have referred, would leave no doubt that this prescribed duty of the plaintiff extended to cases like that before us.    We do not think that the use of that word justifies a different construction.

Assuming, then, that such was the duty of the plaintiff, it follows that it was entitled to charge toll for these logs.    The obligation prescribed in the act, and the compensation allowed, are reciprocal. The one is the consideration for the other.

It does not affect the question before us—the right to recover any tolls—that, as to the logs for which tolls are charged, the plaintiff may have done little or nothing beyond the making and maintaining of its improvements, facilitating the floating of logs.

The force of the considerations to which we have referred may be more apparent if it be supposed that this case were reversed; that when these logs commenced coming down an obstruction had occurred at the head of the mass and within the plaintiff's limits, and that,

the plaintiff doing nothing to prevent such a result, the whole mass had become jammed there so that it became very difficult and expensive to extricate the logs; and that this defendant had brought an action to recover damages for this plaintiff's neglect. It would seem to be insufficient to plead in defence that the logs had not been driven down by the owners, but, escaping by accident from their control, had been swept down by the force of the current alone. That would seem to confine to too narrow a limit the statutory duty of the improvement company.

Order reversed.