## NAMAKAN LUMBER COMPANY v. RAINY LAKE RIVER BOOM CORPORATION.[1]

July 28, 1911.

Nos. 17,160—(184).

**Sorting logs — contract — evidence.**

In this, an action involving charges made by the defendant company for handling logs through its boom and sorting works in Rainy Lake river, the evidence sustains the finding of the trial court that "no contract, either express or implied, existed between the plaintiff and defendant for the handling, sorting, and delivering of * * * its logs during the years 1905 and 1906." International Boom Co. v. Rainy Lake River Boom Corp. 97 Minn. 513, distinguished.

[1]Reported in 132 N. W. 259.

**Levy of toll — statutory authority.**

> The defendant was not authorized by chapter 221, Laws 1889, as amended by chapter 89, Laws 1905, to levy tolls on logs passing through its sorting works located in the Rainy Lake river; it not having been requested by the owner to drive, handle, or sort such logs, or authorized so to do by reason of the fact that such logs were impeding the main drive.

Action in the district court for Beltrami county to recover possession of a quantity of saw logs, or for $6,000, the value thereof, and $1,000 damages for detention thereof. Defendant, in its answer, claimed a lien upon all of the logs, pursuant to Laws 1889, c. 221, for tolls, costs and expenses, amounting to $25,836. The reply set up that Rainy Lake river is the international boundary between the United States and Canada; that by the treaty of 1842 between the United States and Great Britain the river is a navigable highway, open and free to all citizens and subjects of the United States and Great Britain; that the stream is the northern boundary of the State of Minnesota and the state has no jurisdiction over the traffic upon said stream and no jurisdiction whatever beyond the centre of the stream; that plaintiff was informed the Secretary of War granted permission in the year 1904 to maintain such boom upon the express condition no charge should ever be made for logs passed through defendant's boom, but that defendant has assumed to make such charge and to detain logs until such charges are paid.

The case was tried before Wright, J., who made findings of fact as stated in the opinion and ordered judgment in favor of plaintiff. From the judgment entered pursuant to the findings, defendant appealed. Affirmed.

*Charles Loring* and *Dodge & Tautges,* for appellant.
*R. J. Powell* and *C. J. Rockwood,* for respondent.

SIMPSON, J.

A replevin action to recover possession of logs. The question involved is the right of the defendant to hold the logs under a lien.

The defendant is a boom corporation organized under the laws of Minnesota, maintaining improvements, booms, and sorting works

in Rainy Lake river. Logs belonging to plaintiff having been by it handled through its sorting works in the years 1905 and 1906, it claims a lien right upon a portion of these logs now in its possession for its charges and tolls for so handling such logs. Its claim is based, first, upon the statute of Minnesota (chapter 221, p. 350, Laws 1889, as amended by chapter 89, p. 106, Laws 1905 [R. L. Supp. 1909, §§ 2934—1, 2934—2]) giving to boom companies a lien upon logs coming down the river, for reasonable tolls, costs, and expenses chargeable for improvements made in such river, and for services rendered; and, second, under an implied contract for the use of its improvements and for services. The case was tried by the court without a jury, and judgment rendered that the plaintiff was the owner of and entitled to the possession of the logs, and that the defendant was not entitled to any lien thereon. The defendant appeals from the judgment.

These facts appear: The defendant corporation was organized in 1889 under the laws of Minnesota. The purpose of the incorporation, as stated in the articles, was to take possession of and construct booms for the collecting and safe-keeping of logs upon and adjoining the southerly shore of the Rainy Lake river. By amendment to its articles in 1905 the purpose of the corporation was stated to be—adopting the language of the Minnesota statutes above referred to—to improve the Rainy Lake river so as to make the driving of logs thereon practicable, and to drive, boom, and assort logs and timber in said river, and to charge tolls therefor. Immediately after its incorporation it took possession of a portion of the Rainy Lake river and so improved the same as to make driving of logs thereon reasonably practicable and certain. Its improvements in the main consisted of a boom and sorting works extending from the southerly shore out into the stream about four hundred fifty feet to the main boom, which extended up the river several miles in practically a straight line. Above the main boom the defendant corporation maintained a sheer boom, extending approximately from the line of the main boom diagonally upstream to the northerly or Canadian side.

Between the southerly end of the sheer boom and the upper end

of the main boom was an open channel three hundred feet wide, permitting the passage of boats.   This was known as the "steamboat channel."   Because of the direction of the current of the river this channel did not permit the passage of logs floating with the current.   There was another gap in the sheer boom, about seventy feet from the Canadian shore, which could be used for purposes of navigation.   Below the sorting works were pockets, with outlets, adapted for holding and delivering separated logs and timbers.   The upper end of the main boom—that is, the boom extending up and down the river—was on the northerly or Canadian side of the river.   In other words, it was north of the thalweg or middle of the main channel of the river.   While this boom, as it extended down the river in a straight line, crossed the main channel at one place, the lower end and the sorting gap were also on the northerly or Canadian side of the thalweg.   Thus the sheer boom, about two-thirds in extent of the main boom, a part of the sorting works, including the sorting gap, and a considerable portion of the booming grounds, constructed and maintained by the defendant corporation, were on the northerly or Canadian side of the river.

The plaintiff, the Namakan Lumber Company, was engaged in logging.   In the carrying on of that business, during the seasons of 1905 and 1906, it put loose logs into the Rainy Lake river at points above the boom and works of the defendant company.   These logs were cut, partly on the Canadian side and partly on the American side of the river, and were put into the river from both sides.   Its logs were destined to the mill of the Rainy River Lumber Company, located below defendant's works on the Canadian shore.   During the time here involved, the Rainy River Lumber Company cut logs on the Canadian side of the river above the works of the defendant and floated such logs down the river to its mill.   In the season of 1906 the Shevlin-Mathieu Lumber Company floated logs down the river, cut by it above the defendant's works on both sides of the river, destined for its mill located in Minnesota below the works of the defendant company.   During the two seasons logs and timbers belonging to other persons as well, cut from both sides of the river, were turned loose into the river above defendant's works.   All these

logs and timbers belonging to different owners were mingled and carried by the current down the river into the boom of the defendant company. While there was an opening in the main boom extending up and down the stream through which logs could have been towed, the booms of the defendant caught and held all logs floating down the river with the current until the same were discharged through the sorting gap or from the pockets connected therewith.

The Rainy Lake river flows out of Rainy Lake into the Lake of the Woods. Logs carried down the river into the Lake of the Woods, because of the size of such lake, could not be recovered, except at great expense. Above the works of defendant are rapids and falls in the river which prevent the practical driving of logs down the river in rafts, brails, or sack booms, or in any other way than as loose logs. The plaintiff, when its logs were put in the river, knew of the location of the defendant's boom and sorting works in the river. The plaintiff employed a company other than the defendant to drive its logs down the river to their destination below defendant's works, and such company did, in fact, perform all the service required to drive all plaintiff's logs to such destination, with the exception of the handling of such logs by the defendant company in and through defendant's works. The defendant company was not requested to remove or open its booms to permit logs of the plaintiff to be passed through by the current of the river, and would not have done so, if requested. A part of the logs and timbers coming down the river were boomed and sorted by the defendant company at the request of the owners thereof. To do this work the boom company was obliged to gather all the mingled logs coming down the river, and separate the logs and timbers belonging to such owners from the mingled logs. During the season of 1905 this resulted in the separation of all other logs from the plaintiff's logs. The plaintiff's logs were then passed through the defendant's works and permitted to float down the river to their destination at plaintiff's request. During the season of 1906, the plaintiff's logs mingled with the Shevlin-Mathieu Company's logs, were passed through defendant's works, and were permitted to float to their destination.

The plaintiff's logs were, during both seasons, gathered into defendant's boom without request from the plaintiff, but, on the contrary, with notice from the plaintiff to the defendant not to handle plaintiff's logs, and that any attempted charges therefor would be resisted. The Rainy Lake river is a navigable stream, and the boundary water between the United States and the Canadian provinces. Throughout its length the international boundary line is the thalweg of the river, the middle line of the deep channel.

All the above facts were found by the trial court. In addition it was found: "No contract, either express or implied, existed between the plaintiff and defendant for the handling, sorting, and delivering of its logs during the * * * years 1905 and 1906." The correctness of this finding is questioned by the defendant. It is sustained by the evidence. The plaintiff and defendant each understood, prior to and during the driving seasons of 1905 and 1906, that the plaintiff was not willing that the defendant should handle plaintiff's logs for compensation. Plaintiff requested no service, and expressly notified defendant that it would resist the collection of any charges for services or use of defendant's works. The plaintiff stood strictly on its claimed right to float its logs, unobstructed, down the stream to their destination. The element of assent to or voluntary acceptance of service was wholly lacking. The fact that the defendant claimed the right to levy toll against plaintiff's logs, and that plaintiff knew this when it put its logs in the river, did not evidence a voluntary acceptance by plaintiff of any proffered service, or an acquiescence in such charges, in view of the express notice that it desired no service and would pay no charges. A contract involves an agreement, a concurring instead of an opposing meeting of minds. The words of the parties expressed no agreement. Their conduct and words together support no inference that an agreement existed. A case involving charges made by this defendant for handling, through its works, the plaintiff's logs during the season of 1904 was brought to this court three times. International Boom Co. v. Rainy Lake River Boom Corp. 97 Minn. 513,

107 N. W. 735; 104 Minn. 152, 116 N. W. 221; 112 Minn. 104, 127 N. W. 382.

The defendant urges that its claim of a right to compensation by contract is established under these decisions, and especially by the suggestion, made in the decision reported in 97 Minn. 513, 107 N. W. 735, "that the evidence conclusively shows an implied contract." The former case in its relevant facts, differs materially from the instant case, and the cases are necessarily distinguished.

It appears from the opinion in 97 Minn. 513, 107 N. W. 735, that early in 1904 the owner of logs gave to defendant a list of its log marks, presumably for the purpose of having those logs separated by the defendant from all other logs. The logs were thereafter collected, handled, and sorted by the defendant, and delivered into a sack boom placed by the owner to receive them. May 31 of that year the owner, by letter, demanded of the defendant the opportunity to participate in sorting the logs on the river, and notified the defendant that it would not pay for sorting or furnishing equipment which it so offered to do and furnish for itself. Thereafter it continued to receive its logs in sack booms at the foot of the defendant's works as before. The defendant's booms could be opened, and were opened, when requested; but no request to open them to let the owner's logs through was made. It appears that the controlling considerations in the former case are absent in the instant case. In the former case an understanding was clearly shown, existing until May 31, and that the defendant was performing services in handling and sorting the logs at the instance of the owner. The letter of May 31, as stated by the court, "is not by any means conclusive that the previously existing contract was then brought to an end. In view of the undisputed fact that plaintiffs continued after the date of that letter to make use of defendant's works, and that their logs were there sorted and delivered to them precisely as before, the letter might well be treated as a mere assertion on their part of the right to make use of defendant's booms and other works without compensation. Of course, this they could not do."

It was made to appear in the former case that the owner elected to use defendant's works for the handling of his logs, and that they

might have been passed through the defendant's booms without handling. In the instant case no understanding that the defendant was to handle plaintiff's logs during the season of 1905 or 1906 at its instance ever existed, and it further appears that it was impracticable for plaintiff to drive its logs in brails or booms, and that, because its logs were mingled with others in the drive, the defendant would not open its boom and let plaintiff's logs through. Again—and this marks a wide divergence between the cases—the plaintiff herein did not depend upon the defendant's service in sorting its logs and delivering them into sack booms; but, independently of defendant's works, the plaintiff was provided with ample boomage to catch its logs floating in the river and to hold and deliver them at their destination, and did so catch them. In the decision in 112 Minn. 104, 127 N. W. 382, it is stated, referring to the notice of May 31, 1904: "Nevertheless the plaintiffs' logs continued to come into the defendant's boom, the necessary services for their protection were rendered by it, and they were redelivered and accepted by the plaintiffs at the foot of the sorting works. Actions sometimes speak louder than words."

It is clear that the position of the owner of the logs in that case was that, while it by words objected to the defendant's further serving it, by deeds it invited such service and was wholly dependent thereon for the safety of its logs. In the instant case, so far as the testimony discloses, while the plaintiff unquestionably was benefited by the separation of its logs from others in defendant's works, it was in fact not dependent thereon, and was all the time able and willing to catch, hold, and separate its logs from all others. It in no way relied on defendant's works. It did no act, either in putting its logs into the river or in gathering and booming them at their point of destination, different from what it would have done, had defendant's works been out of the river. Neither from its conduct nor its words can a request to the defendant to handle its logs be implied.

The trial judge found that there was no contract giving the defendant a claim for services performed thereunder. Such finding

is not inconsistent with the decisions of this court referred to, and is sustained by the evidence.

The defendant claims that, irrespective of any contract, it has a lien right on the logs under the Minnesota statutes, giving a corporation formed thereunder which so improves a stream and keeps it in repair and operates its works as to render driving logs thereon reasonably practicable and certain, the right to charge and collect· reasonable tolls on logs and timber driven and floated on such stream, and a right of lien on such logs and timber for such tolls. Chapter 221, p. 350, Laws 1889, as amended by chapter 89, p. 106, Laws 1905. This claim involves two questions: (1) Whether the improvements of the defendant company, as made, kept in repair, and operated, gave it, under the statute, a right to collect tolls upon all logs passing down the river, where no services were performed in connection with such logs, except the sorting necessary to pass the same through its works, and allow them to float down the river; and (2) whether the Minnesota statute confers any rights upon the defendant company because of the situation of its works in an international boundary stream.

This court has never had occasion to pass upon the first question suggested above. In the cases referred to, involving the right of the defendant company to collect for services performed on logs coming down the river during the season of 1904 under an implied contract, it was held that the defendant company was incorporated for the purpose of carrying on and conducting the business authorized by chapter 221, p. 350, Laws 1889, as amended by chapter 89, p. 106, Laws 1905, and that it was entitled to the benefits of that statute. Whether the defendant corporation is authorized to charge tolls in the instant case, in view of the character of the works maintained by it and the handling of the plaintiff's logs, as such logs were handled by it during the seasons of 1905 and 1906, was not under consideration in those decisions, and was not passed upon. International Boom Co. v. Rainy Lake River Boom Corp. 97 Minn. 513, 107 N. W. 735; 104 Minn. 152, 116 N. W. 221; 112 Minn. 104, 127 N. W. 382.

A corporation organized under chapter 89, p. 106, Laws 1905, is

given three distinct powers: (1) To charge tolls upon all logs float-
ing down the stream improved by the company; (2) to take posses-
sion of logs that might impede the main drive, and drive the same;
and (3) to take charge of and drive, at the owner's request, any
logs coming within the limits of its improvements. In the last two
cases the corporation is authorized to collect compensation for serv-
ices performed in handling logs. In the first case the toll authorized
is clearly to compensate the company for the construction, main-
tenance, and operation of its improvements. The right of the de-
fendant company to exact tolls for plaintiff's logs coming down the
river, if its exists, depends, then, upon this first provision or author-
ity, because clearly the facts do not show any right to charge for serv-
ices under the last two provisions. Under the evidence and findings
the only improvement which the defendant has ever erected in
Rainy Lake river is its sorting works. The piers and booms erected
by the defendant are apparently only for the purpose of holding the
mass of logs while they are being sorted. The defendant boom com-
pany, therefore, as a basis for its charge against the plaintiff's logs,
did nothing except to separate from the mass of logs in the river
plaintiff's logs and allow them to pass through its works.

Chapter 89, p. 106, Laws 1905, in addition to the provisions
hereinbefore referred to, contains the following: "Provided, that
all dams and other works erected under the authority given by this
act shall be so constructed, used and operated as to facilitate and
expedite the driving and handling logs and lumber upon the stream
upon which the same may be erected, *and the corporation making
such improvements hereunder shall have no right to stop logs des-
tined for points below its works on said stream* except where dams
have been constructed to accumulate water for sluicing logs and
flushing the river below the same and in such case shall not detain
logs in any part of the river so as to form a jam or prevent the
prompt delivery of logs destined for points below the works con-
structed under authority of this act."

The legislature clearly did not intend, by prohibiting companies
operating booms and sorting works in a river from detaining logs
destined for points in the river below its works, to thereby author-

ize such corporation to charge tolls for allowing such logs to pass through its works. The provision in reference to sluicing logs and flushing the river below a dam has no application to the defendant's works. A consideration of the provisions of chapter 89, in connection with the special legislation in reference to boom companies, clearly indicates that it was not the intent of the legislature to authorize the construction by incorporated boom companies of sorting works along logging streams at each point where a logowner might desire to take his logs out of the stream, and the charging of tolls against all other logs passing through the sorting works to points below.

The primary purpose in the passage of chapter 221, p. 350, Laws 1889, was apparently to cause the improvement of logging streams throughout the state, so that driving logs thereon might be made practicable. Chapter 221 confers power on corporations organized thereunder to improve streams and their tributaries by clearing and straightening the channels thereof, closing sloughs, erecting sluiceways, booms of all kinds, side-rolling, sluicing, and flooding dams, or otherwise, as may be necessary. It is for this class of improvements, making the driving of logs practicable, that tolls are authorized. By the passage of the law the legislature recognized the necessity in many of the minor streams of the state for some one interested in driving logs thereon to expend considerable sums of money in clearing and straightening the channels, closing sloughs, and constructing booms and dams. In order to distribute equitably this expense among those who might use the stream for floating logs, to any company that might first take possession of the stream and make these improvements authority was given to charge reasonable tolls against logs coming down a stream so improved. The authority given to render services in driving logs is incidental to this main purpose, and confers on the company substantially the powers possessed by owners driving logs in the river.

The distinction must be kept in mind between the nature and the power of a corporation organized under this general statute and the nature and powers of certain chartered boom companies organized by special statutes to take possession of certain of the principal riv-

ers in the state. An examination of these special acts shows that the boom companies organized thereby were given a monopoly in the streams referred to, and were not only empowered to take possession of logs floating or driven within their limits, but were required to do so.

In Osborne v. Knife Falls Boom Corp. 32 Minn. 412, 21 N. W. 704, 50 Am. Rep. 590, this court had under consideration the power and authority of that defendant company. By special act (Sp. Laws 1872, p. 458, c. 106) that company was "authorized and required to receive and take entire control and possession of all logs and timber which may run, come, or be driven within the limits" specified, and boom, scale, and deliver the same. Here the legislature clearly intended to give that company a monopoly in handling and driving logs upon a portion of the St. Louis river within the state, and to authorize a charge against all logs handled by it through its improvements.

No such authority is conferred upon corporations acting under chapter 89, p. 106, Laws 1905. An exclusive right is thereby given to the company first in possession to clear and straighten the river, construct dams, and necessary works therein for driving logs, and for such improvements a company so organized may exact reasonable tolls. But a corporation so acting is given no exclusive right in the matter of handling, sorting, or stopping logs floating down the river. In these matters its rights are substantially the same as those of all owners of logs in the river. The defendant company, as stated, maintained sorting works in the Rainy Lake river, and such booms as were necessarily incident thereto. It was not entitled to tolls for its improvements in the river disconnected from any services rendered in handling logs. For services rendered it is not entitled to a charge against the plaintiff, because the plaintiff's logs were not impeding the main drive, nor was the defendant company requested to drive them; the plaintiff having employed another company to drive its logs, which company performed all necessary services in handling and driving the same, except while they were passed through the sorting works of the defendant company. As to the plaintiff's logs, the defendant company did simply that which

the statute required it to do—allowed them to pass through its boom and float down the stream. For this compliance with the statute the defendant company is not authorized to exact compensation. If it were, it is apparent that successive millowners along a logging stream might, by organizing boom companies as an incident to sorting out their own logs from the mass floating down the stream, impose such successive tolls upon logs destined for the lower points as to wholly destroy the value of such logs.

The conclusion of the trial court that the plaintiff was entitled to the possession of its logs, free from any lien of the defendant company, being sustained for the reasons above stated, it is unnecessary to consider whether a company acting under the provisions of chapter 89, p. 106, Laws 1905, would be authorized to collect tolls for improvements constructed throughout the entire width of the Rainy Lake river, the same being an international boundary stream.

The judgment is affirmed.