WILLIAM HARMON

*v.*

THE CITY OF CHICAGO.

*Filed at Ottawa January 18, 1892.*

1. LICENSING BOATS AND VESSELS — *State and Federal jurisdiction.* An ordinance of a city, passed under legislative authority, provided that no person should keep, use or let for hire any tug, etc., for towing vessels or craft in the Chicago river, its branches, or the slips connecting therewith, or in or about the harbor of the city, without first obtaining a license, for which a fee of $25 was exacted, and a penalty was imposed for violating any of the provisions of the ordinance : *Held,* that such ordinance could not be sustained as an exercise of the police power of the State.

2. SAME — *requiring license fee in Chicago harbor — purpose of license — ordinance construed.* Where a city ordinance provides for the exaction of money for a license to the owners of tug boats to tow vessels from the lake into a river flowing through the city, but fails to state for what purpose the exaction is made, and it is void if a tax for the purpose of raising revenue, but valid if it is merely to obtain a compensation or equivalent for money expended in improving the navigation of the river, it will receive, if possible, such a construction as will sustain rather than defeat the ordinance.

3. SAME — *municipal corporations — power to improve harbor.* Municipal corporations may be empowered by the legislature to pass ordinances for the preservation and regulation of vessels and wharves, to deepen and improve rivers, or to remove and prevent obstructions therein. Such power has been conferred upon the city of Chicago.

4. SAME — *power to exact compensation for use of improved harbor.* The city of Chicago having improved the navigation of the Chicago river and harbor by dredging and deepening the channel of the river and its branches, at its own expense, may, without subjecting itself to the charge of improperly interfering with inter-State or foreign commerce, exact of vessels using the river in its improved condition, a reasonable compensation for the improved commercial facilities thus furnished.

5. SAME — *inter-State commerce — tug boats on the Chicago river.* Tugs licensed by the United States for the coasting trade, employed in towing vessels engaged in inter-State commerce into and out of the Chicago river, will themselves be deemed, in law, as being engaged in inter-State commerce, though their operations are confined largely to the corporate limits of the city of Chicago. The character of the business in which they are employed is the same as that of the vessels they tow.

6. SAME—*whether law interferes with—when void.* Where a law of a State imposes a tax under such circumstances and with such effect as to constitute a regulation of commerce, either foreign or inter-State, it is void on that account; and it makes no difference that the legislative purpose was to raise money for the support of the State government, and not to regulate transportation. It is not the purpose of the law, but its effect, which is to be considered.

7. Where a State, in the exercise of either the police power or the taxing power, passes laws which in their operation are an interference with inter-State or foreign commerce, which Congress has undertaken to regulate, they are in contravention of the constitution and laws of the United States, and are consequently void.

8. But where the license fee or exaction is by way of compensation for improvements in harbors and water-ways, and for the increased facilities of navigation furnished by the State, the tolls or license fees exacted are only a reasonable equivalent for benefits conferred, and are in no sense an improper interference with the commerce itself. The constitutional power of the States to improve navigable waters within their boundaries, and charge all vessels navigating such improved water-ways reasonable tolls or compensation for their use in their improved condition, is affirmed in many cases.

9. SAME—*exclusive power of Congress to regulate.* Since Congress has exercised its constitutional power to regulate inter-State commerce its authority is exclusive, and attempts to regulate or interfere with such commerce by State authority are necessarily invalid, as being repugnant to section 8, of article 1, of the constitution of the United States.

10. STATUTES—ORDINANCES—*presumption of validity.* The presumption is always in favor of the validity of a statute or of an ordinance passed in pursuance of competent legal authority. If the facts shown are susceptible of two constructions, one of which will support and the other defeat a statute or ordinance, the former will be adopted.

11. SAME—*burden of proof on question of validity.* As the burden of showing the invalidity of a statute or ordinance is upon him who asserts it, the intendments will all be against him, and in the absence of evidence on the subject, the facts necessary to establish their validity will be presumed to exist.

12. SAME—*when declared unconstitutional—rule applied to municipal ordinance.* A statute should not be declared unconstitutional unless it is clear, beyond reasonable doubt, that the legislature has transcended its constitutional powers in passing it. The opposition between the constitution and the law should be such that the judge feels a clear and strong conviction of their incompatibility. The same rule has been applied to the question of the unconstitutionality of a municipal ordinance.

APPEAL from the Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. RICHARD S. TUTHILL, Judge, presiding.

This was an action of assumpsit, brought by William Harmon against the city of Chicago, to recover back the sum of $300, paid by the plaintiff on compulsion and under protest, for tug boat licenses. The declaration consisted merely of the common *indebitatus assumpsit* counts, to which the defendant pleaded *non assumpsit*, and the trial was had before the court, a jury being waived, on the following stipulation as to the facts:

"It is hereby stipulated and agreed, that for the purpose of determining the right of the defendant to require of the plaintiff a license, and impose and collect a fine or license fee therefor, under the ordinance of the said defendant hereinafter set forth, the following are the ultimate facts under which the said license was required, and the fine or license fee imposed and collected, viz:

"That on the 26th day of September, 1888, the said plaintiff was the owner and manager of the following steam tugs, viz: Tom Brown, F. S. Butler, J. H. Hackley, C. W. Parker, Bob Teed, A. B. Ward, W. H. Wolf, Crawford, C. B. McClellan, Mary McLane, Success and Wahbun; that said tugs, and each of them, were of twenty tons burden and upwards, and were on the said date, and for a long time prior thereto had been, enrolled and licensed for the coasting trade, in pursuance of and under the provisions of 'Title L' of the Revised Statutes of the United States, to which reference is hereby made and which are made a part hereof; that prior to the date aforesaid, and on the 5th day of March, 1883, the common council of the said city of Chicago, acting under the power supposed to be vested in it by chapter 24 of the Revised Statutes of the State of Illinois, and under which the said city was at said time incorporated, passed and enacted an ordi-

nance regulating the navigation of steam tugs and other vessels on the Chicago river and Lake Michigan, and the waters tributary thereto, requiring that the owner thereof take out a license therefor, and imposing upon him a fine or penalty for failing so to do, which said ordinance is in the words and figures following:

"'Be it ordained by the city council of the city of Chicago:

"'Sec. 1. No person or persons shall keep, use or let for hire any tug, or steam barge or tow-boat, for towing vessels or craft in the Chicago river, its branches or slips connecting therewith, or in and about the harbor of the city of Chicago, without first obtaining a license therefor in the manner and way hereinafter mentioned.

"'Sec. 2. All applications for such license shall be made to the mayor, and upon the payment of twenty-five dollars ($25) to the city collector, a license shall be issued for the period of one year by the city clerk for such tug or steam barge or tow-boat; and it shall be the duty of the city clerk to keep a register of the name of the person to whom such license is granted or transferred, the day when issued or transferred, the number of the license, and the name and description of the tug so licensed.

"'Sec. 3. Every tug or steam barge or tow-boat shall have the number of the license and the name of the owner marked on both sides of such tug or steam barge or tow-boat, in plain, legible figures and letters.

"'Sec. 4. Any individual or person violating any provision of this ordinance shall be subject to a fine of not less than five dollars ($5) nor more than fifty dollars ($50) for each offense.

"'Sec. 5. This ordinance shall be in force from and after its passage.'

"That said steam tugs were enrolled and licensed, in the manner and for the purpose aforesaid, by the United States authorities in and at the Northern District of Illinois, in which ·the said defendant, the said city of Chicago, is situated, and

were, on the 26th day of September, 1888, and for a long time prior thereto had been, engaged in the coasting and foreign trade, and in commerce and navigation, namely, in towing vessels engaged in inter-State commerce into and out of the Chicago river and harbor from and to said Lake Michigan, and, in pursuance of the conduct of the said trade, were navigating the said Chicago river and the waters of Lake Michigan, and the tributaries thereto, which said river is, from time to time, deepened for navigation purposes by dredging, under the direction and at the expense of said city of Chicago; that on the said day the said city collector of the said city of Chicago, the defendant herein, notified the said plaintiff to apply for and take out a license, in pursuance of the requirements of the said ordinance, for each of said steam tugs, and to pay therefor the sum of $25 for each of the said tugs, or the sum of $300 in the aggregate; that said plaintiff thereupon notified the said collector that the said steam tugs, and each of them, were licensed for the coasting trade, in pursuance of and in accordance with the requirements of the laws of the said United States, and were engaged in said trade on the said Chicago river and said Lake Michigan, and the waters tributary thereto, in the manner as aforesaid, and thereupon claimed to the said collector that the said ordinance was invalid, and that the said city of Chicago had no power or authority to require the said plaintiff to take out a license in pursuance of the requirements of the said ordinance, or to pay the said fee of $25 for each of the said steam tugs, and thereupon refused to take out the said license or to pay the said fee, whereupon the said collector of the said defendant caused the said plaintiff to be arrested upon a warrant issued for that purpose, and that while the said plaintiff was under arrest he paid the said license fee under protest, and took out the license as required by the said ordinance and as demanded of him by the said collector, which said license was thereupon issued to him; that the amount of the fees so as aforesaid

paid to the said collector for the said defendant was the sum of $300; that the said sum was paid by the said collector into the treasury of the said defendant, the said city of Chicago, and that the questions which arise on the foregoing state of facts are as follows, viz: First, whether or not the said defendant can require the plaintiff to take out the license and collect therefor the fees provided for in the ordinance aforesaid; second, whether there was vested in the defendant the power to require of the plaintiff the license and fee provided for in the ordinance aforesaid, and in the manner shown by the foregoing state of facts; third, whether the said ordinance, under which said license was required and the said fee was imposed and collected, is legal and binding upon the plaintiff; fourth, whether the plaintiff is not entitled to judgment for the amount of fees so paid by him as aforesaid. It is hereby further stipulated that the said facts may be presented to the court and tried under the pleadings as they now stand, and that an order may be entered in said suit submitting the same to the Hon. Richard S. Tuthill for trial without the intervention of a jury, and that either party shall have the right to appeal from the decision and final judgment of the court herein, in the same manner and to the same extent as they would have if the said case had been tried in the usual and ordinary way."

The counsel for the plaintiff also offered in evidence the following sections of an ordinance of the city of Chicago, to-wit:

"Sec. 1. The inhabitants of all that district of country in the county of Cook and State of Illinois contained within the limits and boundaries hereinafter prescribed shall be a body politic under the name and style of the city of Chicago, and by that name sue and be sued, complain and defend in any court, make and use a common seal and alter it at pleasure, and take and hold, purchase, lease and convey such real and personal or mixed estate as the purposes of the corporation may require, within or without the limits aforesaid.

"Sec. 2. The corporate limits and jurisdiction of the city of Chicago shall embrace and include within the same all of township 39, north, range 14, east of the third principal meridian, and all of sections 31, 32, 33 and fractional section 34, in township 40, north, range 14, east of the third principal meridian, together with so much of the waters and bed of Lake Michigan as lies within one mile of the shore thereof and east of the territory aforesaid.

"Sec. 3. All that portion of the aforesaid territory lying north of the center of the main Chicago river and east of the center of the north branch of said river shall constitute the north division of said city; all that portion of the aforesaid territory lying south of the center of the main Chicago river and south and east of the center of the south branch of said river and of the Illinois and Michigan canal shall constitute the south division of said city; and all that portion of the aforesaid territory lying west of the center of the north and south branches of said river and of the Illinois and Michigan canal shall constitute the west division of said city."

The foregoing being all the evidence given at said trial, the plaintiff submitted five propositions to be held as the law in the decision of the case, asserting, in substance, the invalidity of the ordinance requiring the payment of a license fee by the owners of tug boats used on the Chicago River, and also asserting that said city had no power to exact such license fee, but the court refused to hold said propositions as the law, and gave judgment on the evidence in favor of the defendant. That judgment has been affirmed by the Appellate Court, and the plaintiff now brings the record to this court by a further appeal, the judges of the Appellate Court having granted him the necessary certificate of importance.

Messrs. SCHUYLER & KREMER, for the appellant:

The Chicago river is a navigable water of the United States. *Escanaba Co.* v. *Chicago,* 107 U. S. 678.

The effect of the ordinance is clearly one restraining the free use of the vessels in the employment of commerce, for which they were licensed by the United States. *Weston* v. *Charleston*, 2 Pet. 449; *Moran* v. *New Orleans*, 112 U. S. 69; *Leloup* v. *Port of Mobile*, 127 id. 640; *Sinnot* v. *Davenport*, 22 How. 227; *Ferry Co.* v. *East St. Louis*, 107 U. S. 365; 102 Ill. 560.

The license required is a tax, and an attempt to regulate inter-State commerce on navigable waters, in violation of the constitutional inhibition. *Asher* v. *Texas*, 128 U. S. 129; *Robbins* v. *Shelby Taxing District*, 120 id. 489; *Sands* v. *Improvement Co.* 123 id. 294.

Such a tax is a burden on commerce, and amounts to a regulation of it. *Telegraph Co.* v. *Massachusetts*, 125 U. S. 530; *Steamship Co.* v. *Pennsylvania*, 122 id. 326.

Mr. JONAS HUTCHINSON, Mr. M. W. ROBINSON, and Mr. H. H. MARTIN, for the appellee:

The ordinance is a proper exercise of police power. *Vanderbilt* v. *Adams*, 7 Cow. 347.

The license fee is not a tax on commerce. Licensing is an ordinary mode of exercising police control and regulation. *East St. Louis* v. *Wehrung*, 46 Ill. 392; *Packing Co.* v. *Chicago*, 88 id. 221; *Walker* v. *Springfield*, 94 id. 364; *Ash* v. *People*, 11 Mich. 347; 1 Dillon on Mun. Corp. (3d ed.) sec. 358.

The ordinance is not a regulation of commerce. Cooley's Const. Lim. (5th ed.) 724; *Sherlock* v. *Alling*, 93 U. S. 99; *Gibbons* v. *Ogden*, 9 Wheat. 1; *License cases*, 5 How. 582; *Sinnot* v. *Davenport*, 22 id. 243; *Robbins* v. *Shelby Taxing District*, 120 U. S. 489.

The State has the power to improve the Chicago river, and to exact compensation for the use of the river in its improved condition, from all boats and vessels. *Sands* v. *Improvement Co.* 123 U. S. 288; *Huse* v. *Glover*, 119 id. 543; 11 Biss. 550; *Spooner* v. *McConnell*, 1 McLean, 337.

The fact that a vessel or steamboat is enrolled and licensed under the act of Congress, and is actually engaged in inter-State commerce, does not prevent the States from exacting from its owners compensation for the use of a navigable river, as improved by the State. *Thames Bank* v. *Lovell,* 18 Conn. 500; *Kellogg* v. *Union Co.* 12 id. 8; Gould on Waters, secs. 35, 117; *Packet Co.* v. *Keokuk,* 95 U. S. 80; *Keokuk* v. *Packet Co.* 45 Iowa, 209; *Packet Co.* v. *Aiken,* 121 U. S. 444; *Cooley* v. *Wardens,* 12 How. 298; Cooley's Const. Lim. (5th ed.) 731; *Sands* v. *Improvement Co.* 123 U. S. 288; Houck on Navigable Rivers, secs. 186-209; Angell on Water-courses, sec. 556, note 7.

These decisions rest on the ground that such fees (wharfage, etc..) are compensation for the use of an improvement. *Transportation Co.* v. *Parkersburg,* 107 U. S. 691; *Packet Co.* v. *Keokuk,* 95 id. 80; *Packet Co.* v. *Catlettsburg,* 105 id. 559; *Packet Co.* v. *St. Louis,* 100 id. 423.

Mr. JUSTICE BAILEY delivered the opinion of the Court:

The statement preceding this opinion contains the entire evidence as it appears in the bill of exceptions, but the facts, more briefly, are these: On the 26th day of September, 1888, the plaintiff was the owner and manager of twelve steam tugs, each of twenty tons burden or over, all of which were enrolled and licensed for the coasting trade by the United States authorities in the Northern District of Illinois, in pursuance of the provisions of the Federal Statutes, and were engaged in the coasting and foreign trade and in commerce and navigation, that is to say, in towing vessels engaged in inter-state and foreign commerce into and out of the Chicago river and harbor from and to Lake Michigan, and in pursuance of said trade were navigating said Chicago river, the waters of Lake Michigan, and the tributaries thereto. The Chicago river and harbor are both within the territorial limits and jurisdiction of the city of Chicago, and said river is, from time to time,

deepened for purposes of navigation by dredging, under the direction and at the expense of said city.

At the date above mentioned, there was in force an ordinance of the common council of said city providing that no person should keep, use or let for hire, any tug, steam-barge or tow-boat for towing vessels or craft in the Chicago river, its branches or the slips connecting therewith, or in or about the harbor of the city of Chicago, without first obtaining a license therefor, and providing further that such licenses should issue on payment to the city collector of $25 for each tug, steam-barge or tow-boat, and that any person violating any of the provisions of said ordinance should be subject to a fine of not less than $5 nor more than $50.

On said 26th day of September, 1888, said city collector notified the plaintiff to take out licenses in pursuance of the requirements of said ordinance for each of his said steam-tugs, and to pay the sum of $25 for each of said tugs, being $300 in the aggregate, and the plaintiff thereupon, claiming that as his tugs were licensed for the coasting trade in accordance with the laws of the United States, and were engaged in such trade said ordinance was invalid and said city had no power to require him to take out said license, refused to take the same out or pay the sum charged therefor. Said collector then caused the plaintiff to be arrested upon a warrant issued for that purpose, and while under arrest, the plaintiff paid for and took out said license the amount so paid being $300, which money was by said collector paid into the treasury of said city.

The only controversy here is, as to the validity of said ordinance and the power of the city to require the plaintiff to take out said license and pay the license fee, in view of the fact that his tugs had been enrolled and licensed by the proper authorities of the United States, under the provisions of the Federal Statutes, for the coasting trade, and were engaged in that trade on the Chicago river and the waters of Lake Michigan.

The power of the city council to pass said ordinance is to be found in the thirty-fourth clause of section 1, article 5, of the general act in relation to the incorporation of cities and villages, where authority is given to city councils in cities, "To license, regulate and prohibit wharf-boats, tugs and other boats used about the harbor or within such jurisdiction," that is, within the jurisdiction of the city. As bearing on the same subject, reference may also be made to the thirty-eighth clause of said section which gives authority, "To make regulations in regard to the use of harbors, towing of vessels, opening and passing of bridges." It can not be doubted that, by these provisions, the General Assembly, so far as it could constitutionally do so, had vested in the city council of the city of Chicago the power to pass an ordinance of the character of the one in question.

But it is claimed that said ordinance, so far as it applies to tugs and other boats licensed by the United States for the coasting trade, or engaged in that trade, amounts to a regulation of inter-state commerce, and is violative of that clause, of section 8, article 1, of the Constitution of the United States which provides that, "Congress shall have power to regulate commerce with foreign nations, and among the several States' and with the Indian tribes." If said ordinance is in any proper sense a regulation of inter-state commerce, it must be admitted that, so far as it is so, it is repugnant to this constitutional provision and void. Since Congress has exercised its power in that behalf, its authority is exclusive, and all attempted regulations of inter-state commerce by State authority are necessarily invalid.

When the case was first presented to this court, the counsel for the city sought to sustain the validity of said ordinance upon the sole ground, that its enforcement was merely an exercise of the police power, a power which has not been surrendered to the General Government, but is reserved to the States. In considering that proposition, we reached the con-

-clusion that it was untenable, and as no other ground was suggested upon which the ordinance could be upheld, we held it to be invalid and rendered judgment accordingly. In their petition for a rehearing, counsel have raised an entirely new proposition, viz., that as the Chicago river is kept in repair and made fit for navigation by being from time to time dredged and deepened under the direction and at the expense of the city, the money charged the owners of tugs and other similar vessels as a license fee, may and should be regarded as only a proper compensation and equivalent for the use of the river in its improved condition, and is therefore in no proper sense a tax upon the commerce in which such vessels are engaged.

Where new propositions are raised for the first time on petition for a rehearing, this court may and usually does refuse to consider them, and if our decision in this case had been one which would extend in its results no further than merely to determine whether the city should repay to the plaintiff the $300 sued for, we should have been disposed to adopt that course here. Counsel should not present their cases to this court by piece-meal, but should be prepared, when the case is heard, to urge every consideration upon which they expect to rely. But as our decision involves not merely the title of the city to the small sum of money sued for, but also determines, as a collateral result, the right of the city to collect license fees from all tugs and like vessels navigating the Chicago river which are licensed by the General Government for the coasting trade, we have thought proper, in the exercise of our discretion, to depart from the ordinary rule, and allow the case to be again heard upon all the propositions which counsel, after more mature investigation, should see proper to urge.

We are of the opinion that the ordinance in question can not be sustained on the ground that it is an exercise of the police power. This question is one as to which the decisions of the Supreme Court of the United States are of paramount.

25—140 ILL.

authority, and nothing remains for us to do but to apply the principles laid down by that high tribunal.

The plaintiff's tugs having been licensed by the United States for the coasting trade and being engaged in towing vessels engaged in inter-state commerce into and out of the Chicago river, must themselves be deemed in law to have been engaged in inter-state commerce, although their operations were in fact confined largely to the corporate limits of the city of Chicago. This seems to be settled in principle by the case of *Foster* v. *Commissioners of Pilotage of Mobile*, 22 How. 244. In that case it appeared that the port of Mobile was resorted to by vessels and ships of different sizes, engaged in trade and commerce with foreign nations and between different States, and that the larger of these were compelled, by the shallowness of the water, to anchor in the lower bay, and that the steamboat in question in that case was employed in lightering goods to and from such larger vessels, and in towing such vessels to and from the lower bay and wharves of the city, and in some instances beyond the outer bar and into the Gulf to the distance of several miles. Said steamboat had been enrolled and licensed to carry on the coasting trade, and was seized under a State law requiring the owners of all steamboats navigating the waters of the State, to have the same registered with the probate judge, and imposing a penalty of $500 for a failure so to do. It was held that said steamboat was engaged in the same commerce in which vessels which it was employed to assist were engaged, and was subject to the same rules. In the opinion the court say: "It is quite apparent, from the facts admitted in the case, that this steamboat was employed in aid of vessels engaged in the foreign and coastwise trade and commerce of the United States, either in the delivery of their cargoes, or in towing the vessels themselves to the port of Mobile. The character of the navigation and business in which it was employed can not be distinguished from that in which the vessels it towed or unloaded were engaged. The lightering or

towing was but a prolongation of the voyage of the vessels assisted to their port of destination."

One of the leading cases to which we are referred by counsel for the plaintiff, as bearing upon the question of the validity of the ordinance under consideration, and especially of its validity as an exercise of the police power, is that of *Sinnot* v. *Commissioners of Pilotage of Mobile,* 22 How. 227. That was a case arising under the same State statute in question in the *Foster case* above cited, the only difference between the two cases being, that in that case, the vessel seized was a steamboat employed in lightering and towing vessels arriving at the port of Mobile, while the vessel seized in the *Sinnot case* was one actually engaged in navigation and commerce between the ports of different States. The facts in the *Sinnot case,* more fully stated, are these: In 1854, the legislature of Alabama passed an act requiring each owner of a steamboat navigating the waters of that State, before such boat should leave the port of Mobile, to sign, swear to and file with the probate judge, to be by him recorded, a written statement, setting forth the name of the boat, the name, residence and interest of the owner, and a new statement of like facts in case of the sale of the boat. The act provided also, that if any such owner should navigate any of the waters of the State with such boat without filing the statement thus required, he should forfeit $500, to be recovered by the commissioners of pilotage of the bay of Mobile, either by suit against the owner, or by attachment against the boat. A steamboat engaged in navigation and commerce between New Orleans, Louisiana, and Wetumpka and Montgomery, Alabama, which touched only at Mobile in her trade between said ports, and which had been enrolled and licensed under the act of Congress of February 18, 1795, in relation to the enrollment and license of vessels engaged in the coasting trade, was seized and detained under said act of the legislature of Alabama, and judgment was rendered against her for the penalty of $500. This judgment was

affirmed by the Supreme Court of said State, but said judgment of affirmance being taken by writ of error to the Supreme Court of the United States, was there reversed.

The latter court held, upon the foregoing facts, that vessels licensed under the act of Congress of 1795, had full authority to carry on the coasting trade; that said act specified certain conditions, upon the compliance with which, license would be granted to the owners of vessels; that the Alabama act imposed other and additional conditions to the privilege of carrying on the trade; that there was thus a direct conflict between the act of the State and the act of Congress regulating the trade; that Congress had legislated upon the very subject which the State had undertaken to regulate; that the law of Congress, upon this state of facts was supreme, and that the State law must give way; that a State law, even when enacted in the exercise of the police power reserved to the States, must yield to the act of Congress upon the same subject which is in conflict with the State law and which has been passed by Congress in the exercise of a clear power under the Constitution; that the Alabama law was in conflict with the provisions of the Federal Constitution giving Congress power to regulate commerce among the States, and with the act of Congress upon that subject, and was therefore void. In the *Foster case* also, the same doctrine was held to apply to the boat used in that case for lightering and towing.

The principles established by these cases were again repeated in *Moran, Executor of Cooper* v. *New Orleans,* 112 U. S. 69. In that case it appeared that the city of New Orleans was authorized by a State statute, to levy and impose a license upon all persons pursuing any trade, profession or calling, and to provide for its collection, it being declared by said statute that such license should not be considered as a tax on property. In the exercise of the power thus conferred, said city passed an ordinance to establish the rate of licenses for professions, callings and business, for the year 1880, which

imposed a license fee of $500 upon every member of a firm or company, and upon every agency, person or corporation, owning and running tow-boats to and from the Gulf of Mexico, and a license fee of $50 upon every member of a firm or company, and upon every agent, person or corporation owning and running job-boats within the corporate limits of the city. Cooper was the owner of two steam propellers, each of over 100 tons burden, duly enrolled and licensed at the port of New Orleans, to be employed in the coasting trade, and employed them in towing vessels from the sea up the river to New Orleans, and from that port to the sea. The city of New Orleans brought suit against him for the license fee provided by said ordinance and recovered judgment therefor, which judgment was affirmed by the Supreme Court of the State. On writ of error to the Supreme Court of the United States that judgment was reversed, on the ground that the ordinance imposing the license was a regulation of commerce among the States, and therefore in conflict with the Constitution of the United States and void, it being held that the case fell directly within the rules laid down in the *Sinnot* and *Foster cases.*

Among the propositions stated in the opinion are these: That when a law of a State imposes a tax, under such circumstances and with such effect as to constitute a regulation of commerce, either foreign or inter-state, it is void on that account; that it makes no difference that the legislative purpose was to raise money for the support of the State government, and not to regulate transportation; that it is not the purpose of the law but its effect which is to be considered; and that the right of a State, by the exercise of the taxing power, to impede or embarrass the constitutional operations of the general government, or the rights which its citizens hold under it, have been uniformly denied by that court. In further discussion of these questions it was said:

"Here is not a tax on the profits and income after they have been realized from the business. It is a charge explicitly

made as the price of the privilege of navigating the Mississippi between New Orleans and the Gulf, in the coast-wise trade; as the condition on which the State of Louisiana consents that the boats of the plaintiff in error may be employed by him according to the terms of the license granted under the authority of Congress. The sole occupation sought to be subjected to the tax is that of using and enjoying the license of the United States to employ these particular vessels in the coasting trade; and the State thus seeks to burden with an exaction, fixed at its own pleasure, the very right to which the plaintiff in error is entitled under, and which he derives from, the Constitution and laws of the United States. The Louisiana statute declares expressly that if he refuses or neglects to pay the license tax imposed upon him, for using his boats in this way, he shall not be permitted to act under and avail himself of the license granted by the United States, but may be enjoined from doing so by judicial process. The conflict between the two authorities is direct and express. What the one declares may be done without the tax, the other declares shall not be done except upon payment of the tax. In such an opposition the only question is, which is the superior authority, and reduced to that, it furnishes its own answer."

It will be observed that in the cases above cited, the State laws which are held to be an improper interference with inter-state commerce, were passed in the exercise of either the police power or the taxing power, and so far as our investigations have gone, the same thing is true of all other decisions of the Federal Courts where the same principle has been enforced. The *Sinnot* and *Foster cases* involved the validity of a State statute which had no relation to the fiscal concerns of the State, but which was passed merely as a police regulation, the penalty imposed being merely by way of punishment for disobedience to its provisions. The city ordinance in question in the *Moran case*, on the other hand, seems to have been adopted merely as a fiscal regulation, and was manifestly an

attempted exercise of the taxing power. In the light of these decisions, it must be held to be settled law, that where a State, in the exercise of either the police power or the taxing power, passes laws which, in their operation, are an interference with inter-state or foreign commerce which Congress has undertaken to regulate, they are in contravention of the Constitution and laws of the United States, and are consequently void.

There is another class of cases, however, quite distinct from those above cited, in no respect in conflict with them but involving essentially different principles, where the exaction by a State from vessel owners of a payment of money for the right to use and navigate certain of the public navigable waters of the United States has been upheld by the Federal Courts. These are cases where the payments exacted are by way of compensation for improvements in water-ways, and increased facilities of navigation, furnished at the expense of the State. In such cases it is held that the tolls exacted are only a reasonable equivalent for benefits conferred, and are in no sense an improper interference with the commerce itself.

Among cases of this character, *Huse* v. *Glover*, 119 U. S. 543, may be cited. That was a bill in equity to restrain the canal commissioners from exacting tolls upon the complainant's vessels passing through the waters of the Illinois River. The bill sets up an act of the Illinois Legislature passed in February, 1867, providing for the improvement of the navigation of the Illinois River, by the construction of a lock and dam at Henry, and also at Copperas Creek, and creating a board of canal commissioners, with authority to superintend. the construction of said locks and dams, and to control and manage them when constructed, and to prescribe reasonable rates of toll for the passage of vessels through said locks. Said act further provided that all tolls received for the use of the locks, not necessary to keep the same in repair and to pay the expenses of their collection, should be paid quarterly into the State treasury, as a part of the general revenue of the

State. Said locks and dams were constructed at an expense of several hundred thousand dollars, which was principally borne by the State, although a small portion of it is said to have been contributed by the United States. The complainants were citizens of Illinois, and were engaged in cutting ice at Peru and other points on the Illinois River, and transporting it, on that river and the Mississippi River, to St. Louis, Memphis and other southern markets, and in connection with that business, they were also carrying on a general transportation business, and were constantly using from three to six steamboats, and from thirty to sixty barges, varying from 125 to 1000 tons burden, all licensed and registered under the act of Congress. The bill alleged that prior to the construction of said dams, the complainants were able to navigate said river without interruption, except such as were incident to the ordinary use of the channel in its natural state, and that said dams were an impediment in the way of the free navigation of the river, and of no practical advantage to the complainants; that they had paid large sums of money for tolls upon the tonnage or measurement of their steamboats and barges and upon the cargoes transported thereon.

It was alleged that said State statute was in violation of the ordinance of July 13, 1787, for the government of the territory of the United States north-west of the Ohio River, providing that the navigable waters leading into the Mississippi and St. Lawrence should be common highways and forever free to the Citizens of the United States, and of the States which should be admitted into the Confederacy, without any tax, duty or impost therefor; and also of the article in the Constitution of the United States which prohibits the imposing of a tonnage duty by any State, without the consent of Congress. The court, in holding both these objections untenable, say:

"The exaction of tolls for passage through the locks is as compensation for the use of artificial facilities constructed, not as an impost upon the navigation of the stream. The

provision of the clause that the navigable streams should be highways without any tax, impost or duty, has reference to their navigation in their natural state. It did not contemplate that such navigation might not be improved by artificial means, by the removal of obstructions, or by the making of dams for deepening the waters, or by turning into the rivers waters from other streams to increase their depth. For outlays caused by such works the State may exact reasonable tolls. They are like charges for the use of wharves and docks constructed to facilitate the landing of persons and freight, and the taking them on board, or for the repair of vessels.

"The State is interested in the domestic as well as the inter-state and foreign commerce conducted on the Illinois River, and to increase its facilities, and thus augment its growth, it has full power. It is only when, in the judgment of Congress, its action is deemed to encroach upon the navigation of the river as a means of inter-state and foreign commerce, that that body may interfere and control and supersede it. If, in the opinion of the State, greater benefit would result to her commerce by the improvements made, than by having the river in its natural state—and on that point the State must necessarily determine for itself—it may authorize them, although increased inconvenience and expense may thereby result to the business of individuals. The private inconvenience must yield to the public good. The opening of a new highway, or the improvement of an old one, the building of a railroad, and many other works, in which the public are interested, may materially diminish business in certain quarters and increase it in others; yet for the loss resulting, the sufferers have no legal ground of complaint. How the highways of the State, whether on land or by water, shall be best improved for the public good, is a matter for State determination, subject always to the right of Congress to interpose in the cases mentioned.

"By the terms tax, impost, and duty, mentioned in the ordinance, is meant a charge for the use of the government, not

compensation for improvements. The fact that if any surplus remains from the tolls, over what is used to keep the locks in repair and for their collection, it is to be paid into the State treasury as a part of the revenue of the State, does not change the character of the toll or impost. In prescribing the rates, it would be impossible to state in advance what the tolls would amount to in the aggregate. That would depend upon the business done, that is, the number of the vessels and amount of freight which may pass through the locks. Some disposition of the surplus is necessary until its use shall be required, and it may as well be placed in the State treasury and probably better than anywhere else." See also opinion of Mr. Justice Harlan in the same case in the Circuit Court, reported as *Huse* v. *Glover*, 11 Bissell, 550.

In the foregoing case the right to charge tolls as a compensation for increased facilities in the navigation of the river is placed upon the same footing with the right to erect wharves and charge wharfage for their use by vessels navigating the river. As illustrating the rule, the case of *Packet Co.* v. *Keokuk*, 95 U. S. 80, is cited by the court. That was a suit brought by the City of Keokuk to recover of the Packet Company certain wharfages charged under State authority, and the court, affirming a judgment of the State courts in favor of the plaintiff, said:

"If the charge is clearly a duty, a tax, or burden, which in its essence is a contribution claimed for the privilege of entering the port of Keokuk, or remaining in it, or departing from it, imposed, as it is, by authority of the State, and measured by the capacity of the vessel, it is doubtless embraced by the constitutional prohibition of such duty. But a charge for services rendered or for conveniences provided is in no sense a tax or duty. It is not a hindrance or impediment to free navigation. The prohibition to the State against the imposition of a duty of tonnage was designed to guard against local hindrances to trade and carriage by vessels, not to relieve

them from liability to claims for assistance rendered and facilities furnished to trade and commerce. It is a tax or duty that is prohibited; something imposed by virtue of sovereignty, not claimed in right of proprietorship."

In *Sands* v. *Manistee River Improvement Co.* 123 U. S. 288, it was held that the exaction of tolls, under a State statute, for the use of an improved natural water-way, is not within the prohibition of the Constitution of the United States, that no State shall deprive a person of his property without due process of law; that the internal commerce of a State, that is, the commerce which is wholly confined within its limits, is as much under its control, as foreign or inter-state commerce is under the control of the national government; and to encourage the growth of this commerce and to render it safe, States may provide for the removal of obstructions from their rivers and harbors, and deepen their channels, and improve them in other ways, and levy a general tax or toll upon those who use the improvement to meet their cost, provided the free navigation of the waters, as permitted under and by the laws of the United States is not impaired, and provided any system for the improvement of their navigation provided by the general government is not defeated. In this case the rule established in *Huse* v. *Glover*, supra, is again affirmed. See also, *Transportation Co.* v. *Petersburg*, 107 U. S. 691; *Escanaba Co.* v. *Chicago*, id. 678; *Morgan Steamship Co.* v. *Louisiana*, 118 id. 455; *Cooley* v. *Board of Wardens*, 12 How. 299.

The constitutional power of the States to improve navigable waters within their boundaries, and charge all vessels navigating such improved water-ways, reasonable tolls or compensation for their use in their improved condition, is affirmed by the following decisions of the State courts: *Kellogg* v. *Union Co.* 12 Conn. 8; *Thames Bank* v. *Lovell*, 18 id. 500; *Wisconsin River Improvement Co.* v. *Manson,* 43 Wis. 255; *Benjamin* v. *Manistee River Improvement Co.* 42 Mich. 628; *Nelson* v. *Cheboygan Slack-water Navigation Co.* 44 id. 7; *Manistee River*

*Improvement Co.* v. *Sands,* 53 id. 593 ; *Carondelet Co.* v. *Parker,* 29 La. Ann. 430 ; *Manongahela Bridge Co.* v. *Kirk,* 46 Pa. St. 112 ; *McReynolds* v. *Smallhouse,* 8 Bush, 447 ; *Osborne* v. *Boom Co.* 32 Minn. 412.    See also, Cooley on Const. Lim. (5th ed.) 731 ; Houck on Navigable Rivers, secs. 186-209.

The question presented by the present record then is, whether the license fee imposed by the city of Chicago upon the owners of steam tugs engaged in towing boats engaged in inter-state and foreign commerce, into and out of the Chicago river and harbor, to and from Lake Michigan, must, under the facts appearing in the stipulation, be regarded as a tax upon the commerce in which said tugs are engaged, or whether it may not properly be held to be a payment exacted by the city by way of an equivalent or compensation for the use of the improved water-way provided by the city, by dredging and thereby deepening the Chicago River at its own expense.

In determining this question, it should be remembered, that the presumption is always in favor of the validity of a statute or of an ordinance passed in pursuance of competent statutory authority.    When therefore the facts shown are susceptible of two constructions, one of which will support and the other defeat a statute or ordinance, the former will be adopted. And as the burden of showing the invalidity of a statute or ordinance is upon him who asserts it, the intendments will all be against him, and in the absence of evidence on the subject, the facts necessary to establish their validity, will be presumed to exist.

The power of the General Assembly to delegate to the city of Chicago authority to deepen or otherwise improve the Chicago river and harbor will scarcely be questioned.    In Gould on Waters, section 117, the author, speaking of municipal corporations, says : "They may be empowered by the legislature to pass ordinances for the preservation of their harbors and water-channels, and the regulation of vessels and wharves ; to deepen and improve rivers, or to remove and prevent obstruc-

tions therein." This court, if it has not expressly decided, has at least recognized, in various cases, the same rule. *Goodrich* v. *City of Chicago,* 20 Ill. 445; *Wright* v. *City of Chicago,* id. 252; *Elston* v. *City of Chicago,* 40 id. 514.

The General Assembly, not only in the original charter of the city of Chicago, but in repeated acts of legislation since that time, has conferred upon said city the power to deepen and otherwise improve the Chicago river and harbor, and also the right to exact, in some form, compensation for their use in their improved condition, but the only acts to which reference need be made are, the act of February 13, 1863, reducing the charter of said city and the amendments thereto to one' act; and the general act providing for the incorporation of cities and villages, in force July 1, 1872. Subdivision 53, of section 8, chapter 4, of the former of these acts declared that "the harbor of the city shall include the piers and so much of Lake Michigan as lies within the distance of one mile into the lake, and the Chicago River and its branches to their respective sources;" and empowered the city, among other things, "to preserve the harbor," and, "to prevent and remove all obstructions therein;" and the second subdivision of said section empowered the city, "to remove and prevent all obstructions in the waters, which are public highways of said city, and to widen, straighten and deepen the same."

Subdivisions 30 to 38, of section 1, article 5, of the latter of said acts, which we have already cited in part, give the city council of cities, power, "To deepen, widen, dock, cover, wall, alter, or change, the channel of water-courses; to construct and keep in repair canals and slips for the accomodation of commerce; to erect and keep in repair public landing places, wharves, docks and levees; to regulate and control the use of public and private landing places, wharves, docks and levees; to control and regulate the anchorage, moorage and landing of all water-craft and their cargoes within the jurisdiction of the corporation; to license, regulate and prohibit

wharf-boats, tugs and other boats used about the harbor or within such jurisdiction; to fix the rate of wharfage and dockage; to collect wharfage and dockage from all boats, rafts or other craft landing at or using any public landing place, wharf, dock or levee within the limits of the corporation; to make regulations in regard to the use of harbors, towing of vessels, opening of bridges."

The stipulation admits that the Chicago River, forming as it does a part of the Chicago harbor, is, from time to time, deepened, for the purpose of navigation, by the city, by dredging, at its own expense. The river is thus kept in the condition necessary to its convenient navigation, if not by steam tugs, at least by the larger vessels which it is the business of such tugs to tow up and down it. The facilities for navigating the river are thus preserved and kept in existence by the city at its expense. The amount of money annually expended by the city in dredging the river is not stated in the stipulation, but the presumption being in favor of the validity of the ordinance in question, and it being admitted that the city is from time to time expending money for dredging, it will be presumed, until the contrary is shown, that the amount expended has been sufficient to make the license fee exacted by the ordinance, of the owners of tugs in use on the river, no more than a fair equivalent therefor.

It can not be doubted, in the light of the authorities above cited, that the city, having improved the navigation of the river at its own expense, could, without subjecting itself to the charge of improperly interfering with inter-state or foreign commerce, exact of vessels using the river in its improved condition, a reasonable compensation for the improved commercial facilities thus furnished. The question is, whether the license fee imposed by the ordinance can be construed as being exacted by way of compensation for benefits conferred, or whether it must be regarded as a tax for purposes of revenue.

As to the purposes for which the license fee is exacted the ordinance is silent. That merely provides that no person shall keep, own or let for hire, any tug, etc., for towing craft on the Chicago River, its branches or the slips connected therewith, or in or about the harbor of Chicago, without first obtaining a license therefor, the amount of the license fee being placed at $25 for each tug. So far as the exaction is explained by the ordinance, it may be in the nature of a tax for the purpose of raising revenue, or of a compensation or equivalent for money expended by the city in improving the navigation of the river. Under these circumstances, it should receive that construction which will sustain rather than defeat the ordinance, if, under recognized rules of law, it is susceptible of that construction. The city council, at least so long as they have not declared their purposes in passing the ordinance, should be held to have intended to act within, and not in excess of their powers.

A statute should not be declared unconstitutional unless it is clear beyond reasonable doubt that the legislature has transcended its constitutional powers in passing it. *Home Ins. Co.* v. *Swigert*, 104 Ill. 653; *Hawthorn* v. *The People*, 109 id. 302. "The opposition between the Constitution and the law should be such that the judge feels a clear and strong conviction of their incompatibility with each other." *Fletcher* v. *Peck*, 6 Cranch, 87. The same rule has been applied to the question of the unconstitutionality of a municipal ordinance. *Osborn* v. *Mobile*, 44 Ala. 493. If then there is any admissible construction of the ordinance which will bring it into harmony with the Constitution, such construction should be adopted.

That the imposition of a license fee is a proper mode of exacting compensation for benefits conferred is well supported by the authorities. Thus, in *Cincinnati* v. *Bryson*, 15 Ohio, 625, a license fee exacted for dray-men was sustained upon the ground, that it was only a mode of collecting compensa-

tion for the expense of keeping the streets in repair for their use. The court, in their opinion, say: "The employment of drays, hacks, omnibuses and other heavy vehicles, upon the pavements, causes no inconsiderable amount of expenditure to the city, in the way of repairing the streets and alleys. · It is manifest to every one that, in a large city, vehicles of this description, cause great destruction to the public ways; far greater than the usual ordinary travel of citizens otherwise employed. There is therefore no injustice in exacting a reasonable portion of the expense which such special occcupations cause to the community; and those which enjoy the special privilege can refuse to bear a reasonable portion of the burden but with an ill grace." The same rule is laid down in *Marmet* v. *The State*, 45 Ohio St. 63. In that case a statute provided that, in cities of the first class, no person should be engaged in the business or professions therein mentioned, until he should have obtained a license therefor, and by a subsequent section of said act, the owners of different kinds of vehicles used upon the streets of such cities were required to pay certain license fees. Certain persons having been convicted and fined for using vehicles upon the streets of Cincinnati without a license, the cases were taken to the Supreme Court, and in that court it was urged, among other points, that said statute was not a proper exercise of the taxing power, and that said statute was therefore unconstitutional and void. The court, after considering that question, said: "By way of conclusion, without undertaking to lay down any general rule as to the power to license or tax occupations, and confining our holding to the necessities of the case before us, we think it may safely be affirmed, upon both principle and authority, that power to regulate by license, and to compel payment of a reasonable fee, may be maintained where a special benefit is conferred at the expense of the general public, or the business imposes a special burden on the public, or where the business is injurious to or involves danger to the

public.   And believing that the exactions required by the sections of the law in question here fairly come within the rule thus stated, we hold them to be valid."

In *City of Boston* v. *Schaffer*, 9 Pick. 415, the validity of a statute authorizing the mayor and aldermen of Boston to exact a license fee from theatrical exhibitions, was questioned on the ground that it was not competent for the legislature to grant to a town or city power to assess a tax which was not general.   The court, in sustaining the validity of the statute, said:  "If this were a tax, the objection would be valid; but the price to be paid for the license is in the nature of an excise on a particular employment.   The levying of an excise has been practiced in regard to other occupations, and the constitutionality of it has never been doubted.   There can, therefore, be no objection in the present case, admitting theatrical entertainments to be as meritorious as other occupations.   But it seems to be peculiarly proper in employments of this kind.   They require to be watched.   Towns are put to expense in preserving order, and it is proper they should be indemnified for inconveniences or injuries occasioned by employments of this nature."   To similar effect see, *St. Louis* v. *Green*, 7 Mo. App.. 468 ; *Frommer* v. *Richmond*, 31 Gratt. 646 ; *Charleston* v. *Pepper*, 1 Rich. (S. C.) 364.

We are of the opinion that it is a reasonable and therefore admissible construction of both the ordinance in question, and of the statute in pursuance of which it was passed, that the license fees imposed upon the owners of steam-tugs and other similar craft navigating the Chicago River, were merely by way of a toll, compensation or equivalent for the use of the river in its improved condition.   Such being the case, that construction, in support of the ordinance and statute, is the one which must be adopted.   In this view, neither the ordinance nor statute is in any degree an improper interference with inter-state or foreign commerce, or in conflict with the Constitution or laws of the United States in that behalf.

26—140 ILL.

It follows that the ordinance is valid, and that the license fees sought to be recovered back in this suit were properly imposed.

The judgment will be affirmed.              *Judgment affirmed.*

MAGRUDER, C. J.: It is desirable that the decision of this case should be such as to enable the parties interested to take it to the Supreme Court of the United States. Aside from this consideration, I think the conclusion reached upon the former hearing was the correct one for the reasons stated in *Harmon* v. *City of Chicago*, 26 North Eastern Reporter, 697.