Wanamaker, J.,
dissenting from original opinion:
Lest We Forget. In 1912 the people of Ohio by an overwhelming vote adopted a new Magna Charta, a new Bill of Bights, by which it was clearly sought to accomplish two radical constitutional changes in the powers and policies of the state government:
First: The enlargement and enforcement of the people’s powers in their government.
Second: The enlargement and enforcement of human rights in their government.
*50 Ohio’s old Bill of Rights contains this significant language: ‘ ‘ Government is instituted for their [the people’s] equal protection cmd benefit•”
It had long been obvious that that “protection and benefit” had not been adequate or effectual in protecting the great army of industrial workers of the state.
The then status of labor disclosed serious mischiefs that called loudly for sane and reasonable reforms. These mischiefs may be grouped under three headings:
(a) An appalling number of industrial accidents, resulting in the death of thousands and the disability, partial or complete, of a still larger number of working men, working women and working children, causing impairment of the state’s man power and increase of dependency, both harmful not only to the individual but to the body politic.
(&)• In dealing with the large number of deaths and injuries resulting from the negligence of the employer, there had grown up a system of technical rules and ancient precedents of feudal days, ninety-nine per cent, judge-made, and applied under the names of “assumed risk,” “negligence of fellow servant,” “contributory negligence,” etc., all with the effect that the employe in many cases was denied his just relief and compensation for the negligence of his employer, because of said rules and precedents.
(c) A large number of such deaths and injuries were incidental to the natural and inherent dangers of the employment and not the result of any negligence of the employer, but under the policy then *51 prevailing the whole loss and burden fell upon the employe, who was generally the least able to bear it.
The old order of dealing with personal injuries and deaths in the industrial life of the state, caused negligently and otherwise, had become a byword and a shame, for which our courts were largely responsible, and of all the proposals before the constitutional convention none more obviously and unanimously than this demonstrated the sane and settled purpose of that convention to tear up root and branch the old order and substitute a new order by constitutional legislation through proposals 34 and 35 of the new constitutional amendments.
Accordingly the convention, as the cornerstone of the new order and policy of 1912, proposed the following amendment, which was overwhelmingly adopted by the people: “Laws may be passed fixing and regulating the hours of labor, establishing a minimum wage, and providing for the comfort, health, safety and general welfare of all employes; and no other provision of the constitution shall impair or limit this power.”
Clearly the sovereign people hereby intended to put human conservation at the very foundation of its governmental policy.
It may not be amiss in passing to observe that the constitutional convention that framed the new conservation policy, known as Section 34, Article II, was addressed by that great apostle of conservation, Theodore Roosevelt, and this proposal is a most admirable reflection of the Roosevelt view of human conservation as the paramount purpose of all government.
*52 ■ Before beginning an examination and analysis of Section 34 it will be interesting to observe the viewpoint of the convention in proposing it and the viewpoint of the people in overwhelmingly adopting it. This section was labeled and headed on the ballot “Welfare of Employes.” It nowhere mentions the employer. The employes of the state and their representatives in the convention wrote this proposal. Many of the employers at that time, under a mistaken view which many have subsequently changed, bitterly fought the proposal both when it was before the convention and afterwards at the election.. But the employes won at the ballot box, and the conservation policy of Ohio, so far as it could be formulated and fixed by the constitution of the state, was to receive a new life by reason of the new powers granted the general assembly.
The primal and paramount importance given by the convention to this doctrine of conservation appears emphatically from the last clause of said proposal, which reads, “and no other provision of the constitution shall impair or limit this power.” '
It would seem apparent that the convention and the people who adopted its proposal in this, behalf were determined to place human life and limb, health and safety, above money and all other interests and considerations.
I come now to a consideration of the meaning and scope of said Section 34 and subsequent Section 35.
• . In considering the meaning of these sections it may not be amiss to recall some of the old-time doctrines of the old-time judges. Judge Rannev, shortly after the adoption of the Constitution of *53 3 851, used this appropriate language in State, ex rel. Evans, v. Dudley, 1 Ohio St., 437, at page 442:
“We further agree with the counsel for the-relator, that the constitution must receive the same construction since its ratification by the people that it would have received when it passed from the hands of the convention.”
Chief Justice Marshall, in Gibbons v. Ogden, 9 Wheat. (22 U.S.), 1, at page 188, said:
“As men, whose intentions require no concealment, generally employ the words which most directly and aptly express the ideas they intend to convey, the enlightened patriots who framed our constitution, and the people who adopted it, must be understood to have employed words in their natural sense, and to have intended what they have said
The first general assembly convening after' the adoption of this constitutional amendment, in 1913, proceeded to exercise this new power to develop and promote the new policy under said new amendment. Among other things it did was to borrow-from Wisconsin several sections of her conservation statutes for the protection of the working people. The Wisconsin law, Section 2394-48, reads: “Every employer shall furnish employment which shall be safe for the employes therein and shall furnish a place of employment which shall be safe for employes therein and for frequenters thereof and shall furnish and use safety devices and safeguards, and shall adopt and use methods and processes reasonably adequate to render such employment and place of employment safe, and shall do every other thing reasonably necessary to protect the life, health, safé *54 ty and welfare of such employes and frequenters.”
This section was taken bodily and verbatim from Wisconsin, save and except the addition of the language, “follow and obey orders and prescribe hours of labor,” added after the words, “methods and processes.” That statute is now knovta. in the Ohio General Code as Section 871-15.
In connection therewith the general assembly of Ohio proceeded to define the word “safe,” as used in said section, which appears in Section 871-13, subdivision 11, as follows: “The terms ‘safe,’ and ‘safety,’ as applied to any employment or a place of employment shall mean such freedom from danger to the Ufe, health, safety or welfare of employes or frequenters a>s the nature of the employment will reasonably permit, including requirements as to the hours of labor with relation to the health and welfare of employes.” This statute also was at the same time borrowed literally from Wisconsin.
When the state of Ohio adopted the Wisconsin statutes as the Ohio statutes touching these matters, it also adopted in legal effect, by all the decisions of both state and federal courts, Wisconsin’s judicial construction by its supreme court of these statutes so bodily borrowed. The Wisconsin supreme court’s view of the Wisconsin statutes, adopted as the Ohio statutes, is best expressed in Besnys v. Herman Zohrlaut Leather Co., 157 Wis., 203. The syllabus so far as pertinent reads: “1. The duty imposed upon an employer by sec. 1636j and secs. 2394-41 to 2394-71, Stats. 1911, is that the place and the method of carrying on the business in which he is engaged shall be as safe as the nature *55 thereof will reasonably permit as regards safety devices and safeguards, reasonably adequate methods and processes, and any other thing reasonably necessary to protect the life, health, safety, and welfare of the employee
This Wisconsin ease was shortly followed by another, Sadowski, Admx., v. Thomas Furnace Co., found in the same volume, at page 443. The syllabus, so far as pertinent, reads): “1. Secs. 2394-48, 2394-49, Stats., are a part of a new system relative to industrial accidents, by which it was intended to substitute, in lieu of the ordinary rule requiring the master to come up to the standard of reasonable safety as to working place and conditions', the absolute duty to make the employment and place of employment as safe as the nature of the employment will reasonably permit.”
The Ohio human conservation policy of 1912 is bottomed on the 34th section of the legislative article of the constitution, the statutes and judicial constructions thereof adopted from Wisconsin pursuant to such policy, and their general legal effect upon all other statutes in pari materia, coupled with the fact that the constitutional convention and the sovereign people made this section of the constitution paramount to all others. It would seem self-evident that not only legislative acts but judicial construction as well should in no wise “impair,” “limit” or encroach upon the broad, comprehensive and humane provisions before quoted.
We come now to Section 35, a companion or auxiliary section to 34. Section 35, so far as pertinent, reads:
*56 “For the purpose of- providing compensation. to workmen and their dependents, for death, injuries or occupational disease, occasioned in the course of such workmen’s employment, laws may be passed establishing a state fund to be created by compulsory contribution thereto by employers, * . * * and taking away any or all rights of action or defenses from employes and employers; but no right of action shall be ■ taken away from cmy employe when the injury, disease or death arises from failure of the employer to comply with cmy, lawful requirement for the protection of the lives, health and safety of employes.”
The constitutional convention evidently recognized the obvious fact that even when the great powers granted in the preceding Section 34 were fully exhausted by the general assembly in safeguarding life, limb, and health, injuries and death must still inevitably result in the course of employment,— some negligently, some otherwise. Where the fullest conservation had failed to prevent the injury, then the next best thing that could be done would be to supply partial compensation, the maximum under the existing law being for death a total of about $5,000, and for disability from injuries about $3,750.
The constitutional convention obviously understood that the practical enforcement of the lawful requirements provided for in Section 34 would in large measure rest upon the good faith, loyalty, care and diligence of the employer, and provided in Section 35 that before he should be immune from liability beyond the compensation fund, before he should be relieved of the liability of an action at law, he *57 must faithfully comply- with all lawful requirements. If he did so, agreeable to the constitution and the statutes, he would, have a good defense to any such action by the employe. If he was negligent in that behalf, either ignoring or falling short of his duty as to such compliance, the constitution and the law said he should be liable.
Great apprehension has been expressed for fear that any other interpretation of Section 35 than that announced in the majority opinion in this case would undermine the compensation law. This I deny.. I do know, however, that this interpretation absolutely submarines the conservation law, which the constitution regarded as the paramount of the two. .This narrowing down of the welfare of the employe, this limitation upon the liability of the employer, will go on until it creates such dissatisfaction, with our courts and our laws that the working army of the state of Ohio will bring about a more substantial and radical amendment to the Workmen’s Compensation Law.
If you want to retain the workmen’s confidence in partial compensation, you must first give him the full measure of Constitutional conservation.
Where is the stumbling block over which the division amongst the members of this court really arises? It is these three words, “any lawful requirement.” Is there anything uncertain, indefinite or ambiguous about the word “requirement?” Is it not a word in common ordinary use among laymen as well as lawyers, in business as well as upon the bench? Surely so. Is this word “requirement,” when preceded by the word “lawful,” any the more indefinite, *58 uncertain or ambiguous ? Are these two words “lawful requirement,” preceded by the adjective “any,” so confused and ambiguous as to be uncertain in meaning? My understanding is that when a word is used so broadly and comprehensively as to embrace a whole class, it contributes to definiteness and certainty as to its meaning and scope, more so than if it only applied to a part of a class, the dividing line being irregular, a sort of twilight zone difficult of survey.
The real grievance here, bared to the bone, is not that it is impossible to determine what the constitutional provision means, but rather, upon the contrary, that it means so much as to impose a very heavy and unusual liability upon the employer to safeguard the safety of his employe.
Now, taking Sections 34 and 35, reading them and analyzing them together, it will be readily seen that the language “any lawful requirement,” in Section 35, relates directly to the language in the preceding Section 34, as follows:
“Laws may be passed * * * providing for the comfort, health, safety, and general welfare of all employes.”
Any such statute enacted pursuant to that power must of necessity be included within “any lawful requirement.” The legislature makes the laws, not this court; but in this case, the order is reversed, the legislature has the first word, and this court has the last word, squarely in conflict. If a statutory requirement is not a lawful requirement I don’t know what is.
*59 Again, it clearly appears that if the statutory requirement under Section 34 be consistent with that section, it shall not be held to be in conflict with any other provision of the constitution, because Section 34 closes with these words:
“No other provision of the constitution shall impair or limit this power.”
That is, the power under Section 34.
Let us apply the simple, hard, common sense of Chief Justice Marshall to these three words “any lawful requirement.”
Rule 1. “The enlightened patriots who framed our constitution, and the people who adopted it, must be understood to have employed words in their natural sense, and to have intended what they have said.”
Rule 2. The intention of the legislature is to be collected from the words they employ; where there is no ambiguity in the words, there is no room for construction.
The obvious fallacy on which this judgment is founded is this, that the compensation fund and the terms and conditions of the statute providing for its administration and distribution are unduly exaggerated, so as to place compensation before conservation, contrary to and in violation of Section 34.
The legal effect of such a position is to take out of Section 34 the closing words dealing with full conservation, which declare that “no other provision of the constitution shall impair or limit this' power,” and write them into Section 35, which deals primarily with partial compensation.
I do not so understand my duty “to support the constitution.”
*60 The majority opinion in. this case entirely ignores the entire substructure of our' laws, under Sections 34 and 35, which is practical and'effectual conservation. This is like putting up a building without a proper foundation. ' '
The question decided in this case is identical in principle with the question decided in American Woodenware Mfg. Co. v. Schorling, 96 Ohio St., 305. That is a recent case, decided in 1917, and involved only the same single question involved in this casa Following precedent, it would have been quite sufficient for this court to have affirmed this case upon the authority of the opinion in the Schorling case. This court’s refusal so to do constitutes an implied admission that the reasons given in the Schorling case are not adequate, not persuasive, and fail, to legally and logically support the judgment. Accordingly the majority have attempted to furnish a concrete reinforcement for the doctrine announced in the Schorling case, by preparing another opinion upon the same identical question.
I maintain that the attempted reinforcement has utterly failed, and the last state of the ease is worse than the first.
I shall now examine the cases which are relied upon for the concrete reinforcement. They are two federal cases, United States v. Reese, 92 U. S., 214, and United States v. L. Cohen Grocery Co., 255 U. S., 81, involving the Lever Act, decided by the United States supreme court February 28, 1921.
These are both criminal cases. The case at bar is a civil case. It requires no master mind in the law to recognize the fact that the rules of sub *61 stantive law, as well as of adjective.law, and the rules of construction applicable to both, are entirely different in crimina! and civil cases. It is impossible,. therefore, to find any analogy in the strict technical rides that apply in construing oriminal statutes to fit the liberal construction applicable in civil remedial statutes.
This unfortunate reference to the Reese case in the. majority opinion is only emphasized when we come to examine the case itself. Congress passed an act, in the exercise of its powers under the 15th Amendment, making certain acts or conduct as. to voting an offense punishable by fine or imprisonment. Of that act, the court, in the Reese case, says at page 219:
“This is a penal statute, and must be construed strictly; * * * If, taking the. whole statute together, it is apparent that it was not the intention of Congress thus to limit the operation of the act, we cannot give' it that effect.”
That is, what congress has not limited, the court under the guise of construction could not- limit. What was the limitation that the 15th Amendment to the Constitution required? The court answers that question as follows:
“The Fifteenth Amendment does not confer the right of suffrage upon any one. It prevents the States, or the United States, however, from giving preference, in this particular, to one citizen of the United States over another on account of race, color, or previous condition of servitude. * * * It has not been contended, nor can it be, that the amendment confers authority to impose penalties *62 for every wrongful refusal to receive the vote of a qualified elector at State elections. It is only when the wrongful refusal at such an election is because of race, color, or previous condition of servitude, that Congress can interfere, and provide for its punishment. * * * We are, therefore, directly called upon to decide whether a penal statute enacted by Congress,, with its limited powers, which is in general language broad enough to cover wrongful acts without as well as within the constitutional jurisdiction, can be limited by judicial construction so as to make it operate only on that which Congress may rightfully prohibit and punish.”
And the court held soundly and wisely that what the legislature had failed to limit in accordance with the constitutional limit, the court had no right to limit, and that therefore the act exceeded the constitutional authority to that extent.
In both Reese case and Cohen case the judgments are based on the constitutional requirement as to criminal liability. The fundamental doctrine as to such liability is put into the constitutional provision, to the effect that the accused is entitled to know “the nature and cause of the accusation” against him, and every criminal statute must by its very nature and terms conform in spirit and substance to this limitation put into the constitution.
But this rule as to criminal liability created by statute is not and never has been the rule as to civil liability created by statute. There is no such constitutional restraint or limitation as to civil liability, either at common law, constitutional law, or statutory law made pursuant thereto.
*63 The doctrine announced in the Reese and Cohen cases, growing out of the constitutional limitation upon all statutes creating a criminal liability, is only instructive and illuminating in the case at bar because these two classes of liability are so inherently, essentially and radically different.
It would seem to have been the part of candor and wisdom for this court to have sought out a civil case in damages for negligence to furnish some analogy for the case at bar as to a “lawful requirement” instead of the criminal cases referred to in their opinion, which criminal cases are naturally and necessarily limited by the constitutional provision that the accused is entitled to know “the nature and cause of the accusation.”
As before observed, there is no such limitation as to civil liability. The supreme court of the United States, however, has passed upon a statute very similar in its general terms to the scaffolding statute, in Miller v. Stahl, 239 U. S., 426, decided in 1915.
In that case there was under review a statute of the state of Nebraska pertaining to the liability of innkeepers. The statute, Section 3104 of the Nebraska Revised Statutes, included among other things this language: “It shall be the duty of every proprietor, or keeper of such hotel * * * in case of fire therein to give notice of same to all guests and inmates thereof at once and to do all in their power to save such guests and inmates.”
The petition was based particularly upon the last section “all in their power.” It was urged that the statute was too indefinite and uncertain to constitute a liability. Justice McKenna, speaking for the court, at page 432, says:
*64 • ‘ ‘ The command of the statute is that in case of a fire the keepers of hotels must give' ‘notice of the same to all guests and inmates thereof at once, and to do all in their power to’ save such guests and inmates.’ Could the statute exact less? It is the dictate of humanity, and gets nothing from its expression as a legal obligation except a penalty for its violation, and the facts of the case reject any charge that it was .enforced to the extent of risk of the life of anybody or to the injury of anybody. ’ ’
Justice McKenna continues:
“Plaintiff in error contends further that the statute ‘is lacking in due process of law’ because ‘it fails to prescribe any fixed rule.of conduct.’ The argument is that the requirement ‘to do all in one’s power’ fails to inform a man of ordinary intelligence what he must or must not do under given circumstances.
“Rules of conduct must necessarily be expressed in general terms and depend for their application upon circumstances, and circumstances vary. It may be true, as counsel says, that, ‘men are differently constituted,’ some being ‘abject cowards, and few only are real heroes;’ that the brains of some people work ‘ rapidly and normally in the face of danger while other people lose all control over their actions. ’ It is manifest that rules could not be prescribed to meet these varying qualities. Yet all must be brought to judgment. And what better test could be devised than the doing of ‘all in one’s power’ as determined by the circumstances?
“The case falls, therefore, under the rule of Nash v. United States, 229 U. S., 373, and not under the *65 rule of International Harvester Co. v. Missouri, 234 U. S., 199.”
Referring to the Nash case, supra, which by the way was a criminal prosecution, we have, in the language of Mr. Justice Holmes, page 376, the following : ■
“And thereupon it is said that the crime thus defined by the statute contains in its definition an element of degree as to which estimates may differ, with the result that a man might find himself in prison because his honest judgment did not anticipate that of a jury of less competent men. The kindred proposition that ‘the criminality of an act cannot depend upon whether a jury may think it reasonable or unreasonable. There must be some definiteness and certainty,’ is cited from the late Mr. Justice Brewer sitting in the Circuit Court. Tozer v. United States, 52 Fed. Rep., 917, 919.
“But apart from the common law as to restraint of trade thus taken up by the statute the law is full of instances where a man’s fate depends on his estimating rightly, that is, as the jury subsequently estimates it, some matter of degree. If his judgment is wrong, not only may he incur a fine or a short imprisonment, as here; he may incur the penalty of death. ‘An act causing death may be murder, manslaughter, or misadventure according to the degree of danger attending it’ by common experience in the circumstances known to the actor. ‘The very meaning of the fiction of implied malice in such cases at common law was, that a man might have to answer with his life for consequences which he neither intended nor foresaw.’ Commonwealth v. Pierce, 138 Massachusetts, 165, 178. Common *66 wealth v. Chance, 174 Massachusetts, 245, 252. ‘The criterion in such cases is to examine whether common social duty would, under the circumstances, have suggested a more circumspect conduct!. ’ 1 East P. C., 262. If a man should kill another by driving an automobile furiously into a crowd he might be convicted of murder however little he expected the result. * * * If he did no more than drive negligently through a street he might get off with manslaughter or less. * * * And in the last case he might be held although he himself thought that he was acting as a prudent man should. ’ ’
It would seem that the doctrine in these two cases by the supreme court of the United States is a complete answer to the judgment of this court, especially the objection that juries might differ in their verdicts, advanced as a reason for nullifying this statute. Juries differ as to ordinary care. Why shouldn’t they differ as to the highest practicable care?
But we must look to the syllabus of the present case for the doctrine which furnishes the dynamite, not only for the destruction of this statute, but for the destruction of scores of other similar statutes. The syllabus reads:
“1. The term ‘lawful requirement,’ as used in Section 35, Article II of the Constitution, and in Section 1465-76, General Code, comprehends such lawful, specific and definite requirements or standard of conduct as would advise an employer of his legal obligations.”
This syllabus in itself is adroitly drawn. It would be direct and clear if you put the word “only” be *67 fore the word “comprehends.” As it is, no one can literally find fault with it. It is true, but not the whole truth. Of course the words “any lawful requirement,” as used in the constitution, include “specific and definite requirements,” but they include “general” requirements as well. The words specific and definite do not limit the constitutional grant, or at least did not limit it until this court spoke in this case and found a new way of amending the Constitution of the State of Ohio.
That the word “only” is implied in that paragraph of the syllabus will clearly appear from the next proposition of the syllabus:
“2. Section 12593, General Code, providing that employers, who knowingly or negligently furnish or erect unsuitable or improper scaffolding, shall be punished by fine or imprisonment, or both, is indefinite and general in its requirements. It merely prescribes a course of conduct recognizable at common law. Its provisions do not comprise ‘lawful requirement,’ within the meaning of the constitutional or statutory provisions referred to.”
"Why not? Simply because this court has said so. Not because the constitution has said so; nor because the statute says so. This court has simply usurped the business of law-making and Constitution-making.
As made by the sovereign people of the state of Ohio the constitutional provision particularly in question in Section 35 reads as follows:
“But no right of action shall be taken away from any employe when the injury * * * arises from failure of the employer to comply with amy lawful requirement for the protection of the lives, health and safety of employes.”
*68 The new constitution as made by this court by judicial decree now reads:
“But no right of action shall be taken away from any employe when the injury * * * arises from failure of the employer to comply with any specific and definite lawful requirement for the protection of the lives, health and safety of employes, sufficient Ho advise an employer of his legal obligations.’ ”
The italicized words, specific and definite, constitute a new amendment to the people’s constitution, herein made by the supreme court of Ohio.
What the constitution, in the use of the words “any lawful” requirement, says shall be unlimited this court has said shall be limited to “specific and definite” lawful requirements.
It is the most glaring illustration of usurpation of judicial power that I have ever heard of. Judge-made law has been under condemnation for many years. What shall be said of judge-made constitutions under the mask of interpretation, where “there is nothing to interpret, because nothing doubtful?”
The scaffolding statute, Section 12593, referred to in the syllabus, supra, is either a valid statutory requirement, or a valid “lawful requirement,” or it is invalid. There is no middle ground. A man is either dead or alive; there is no middle state so far as human knowledge goes. There is but one inference from reading these two paragraphs, and that is, this court has nullified the scaffolding statute that has been in operation in this state for more than a quarter of a century, upon the ground that it is too ‘“indefinite and uncertain.”
*69 Again the court says, sufficient “to advise an employer of his legal obligations.” Here again is language written into the constitution by the supreme court of Ohio, qualifying this granted right of action given by the sovereign people of the state of Ohio to the employe for the purpose of enforcing the conservation doctrine as against his employer, and as a penalty upon that employer when he fails to take the proper degree of care to comply with a lawful requirement for the protection of life, health and safety of the employe.
Does any lawyer or layman for a moment believe that under the new order declared by the new Constitution of 1912 the legal obligation of the employer to provide for the safety of the employe was to be lessened or lowered from what it had been under the old order ? It is unbelievable.
What was the measure of care “required” under the old order? “Ordinary care,” or the care of an ordinarily prudent person under the circumstances of the particular case.
Was this a ‘ ‘ specific” and ‘ ‘definite’’ requirement? Was this sufficient to “advise an employer of his legal obligations?”
For more than a century it was so held under the common law of both England and America. It was a civil liability cast upon the employer.
Then the new order, under Section 34 of the Constitution, and Section 35 of the Constitution, and the statutes pursuant thereto, provided expressly in Section 871-13, General Code, heretofore referred to, that “The terms ‘safe,’ and ‘safety,’ as applied *70 to any employment or a place of employment shall mean such freedom from danger to the life, health, safety or welfare of employes or frequenters as the nature of the employment will reasonably permit
The legislature merely provided requirements consistent with the new order under Section 34. It raised the standard from “ordinary” care under the circumstances of the case to the “highest practicable care,” or, in the exact language of the statute, “such freedom from danger * * * as the nature of the employment will reasonably permit.”
In raising the standard of care required of the employer from “ordinary” care to the “highest practicable care, ’ ’ how can it be held that the latter is more indefinite and uncertain as to “advising the employer of his legal obligations?”
It requires a credulity, a sophistry, and a juggling with words beyond all reason to accept ordinary care as a legal requirement under the common law, and reject highest practicable care under a statute enacted under the new order, because not providing a valid legal requirement.
Clearly, ordinary care is more indefinite and more uncertain than the highest practicable care. If the latter is nullified because of uncertainty and indefiniteness, the former must also be nullified for uncertainty and indefiniteness, and the employe is absolutely without any protection so far as the duty of the employer is concerned. We have gone backward to barbarism. We have turned from the enlightened 20th-century view of the relations of master and servant, and employer and employe, back to the dark ages, when it was master and slave.
*71 A careful reading of these two paragraphs of the syllabus discloses the unmistakable fact that in construing Sections 34 and 35 of the Constitution this court places the employer in the foreground as of the first consideration, whereas, both in the convention and in the provisions of these proposals themselves, the people placed the employe in the foreground and as the first to be considered in the interpretation and application of these two amendments.
It does depend somewhat upon the point of view, doesn’t it!
But this is not the first case of this character decided by this court touching statutes in general terms. In State v. Schaeffer, 96 Ohio St., 215, in the same volume in which the Schorlmg case, supra, is reported, proposition five of the syllabus reads:
“Section 12603, General Code, prohibiting the operation of a motor vehicle ‘ at a speed greater than is reasonable or proper, having regard for width, traffic, use and the general and usual rules of such road or highway, or so as to endanger the property, life or limb of any person’ is a valid statute.”
The following judges concurred in that syllabus: Nichols, Newman, Jones, Matthias and Johnson.
And mark that this prosecution was for manslaughter, which was based on the commission of a criminal act under the criminal statute. This court upholds that statute, though expressed in terms no less general than this statute. The Schaeffer case, supra, was decided in 1917. I am unable either with telescope or microscope, logical, chemical or legal analysis, to find any distinction of substance be *72 tween the generality of the terms in the scaffolding statute, Section 12593, and the generality of the terms in the automobile section of the Schaeffer case, If a criminal statute be a constitutional statute, certainly every similar civil statute in terms not more indefinite must likewise be constitutional, so far as sufficient definiteness and certainty are concerned. If it be a constitutional statute, its provision is a constitutional lawful requirement, and no legal legerdemain or judicial jugglery can make it otherwise.
In the court’s opinion in this case, no practical, workable rule is laid down touching the indefiniteness or uncertainty necessary to void a statute, to nullify it, and no case is cited announcing any such cloctrine.
The difficulty in this case arises from the fact that the court is confusing general comprehensive language broad enough to include “any lawful requirement” with language so uncertain and indefinite that its meaning cannot be ascertained by applying ordinary sense to ordinary words by the usual rules of construction.
Of course if applying all the recognized rules of construction the court is unable to determine the meaning of the statute so as to make it practically enforceable, such statute must fail simply because its meaning cannot be ascertained upon the application of these generally recognized rules and principles. Numerous Ohio cases have dealt with this question. In Lessee of Cochran’s Heirs v. Loring 17 Ohio, 409, the syllabus reads:
“Though a law is imperfect in its details, it is not void, unless it is so imperfect as to render it impossible to execute it.”
*73 Surely there is nothing imperfect about the constitutional provision “any lawful requirement.” What this court really complains about is that it is too perfect, in that it is too broad, too inclusive,, too comprehensive, and places too much liability upon the employer; gives the employe too much protection.
Judge Peter Hitchcock in the Cochran case, supra, says at page 427:
‘ ‘ The imperfection of a law will not render it void, unless it is so imperfect as to render it utterly impossible to execute it.”
In State, ex rel. Hibbs, v. Board of County Commissioners of Franklin County, 35 Ohio St., 458, it is held in the syllabus;
“An act will not be declared void for uncertainty, if by resort to the recognized aids in the construction of statutes, it is possible to ascertain its meaning.”
In Gordon v. State, 46 Ohio St., 607, the Cochran case, supra, is cited with approval.
In a much later case, Beverstock, a Taxpayer, v. Board of Education, 75 Ohio St., 144, Judge Price in his opinion uses this language at page 149:
“It is urged for plaintiff in error that its language [the statute] is vague and uncertain, and so much so, that it is not susceptible of reasonable interpretation, * * * That is the equivalent of asserting that that part of the section is void for uncertainty.
‘ ‘ This view does not meet with our approval. It is true that the provision is imperfectly, and even bunglingly drawn, and exhibits negligence and per *74 haps ignorance in its phraseology, but these marks should not defeat the operation of the statute, if we can, by the fair use of its language, arrive at the true legislative purpose. * * * It is the duty of the court when called upon to deal with the legislation of a coordinate department of our government, to so construe a statute, if possible, as to give it a sensible effect and make it of binding force. A statute can not be held void for uncertainty, if any reasonable and practical construction can be given to its language. * * * It is the bounden duty of courts to endeavor by every rule of construction to ascertain the meaning of,- and give full force and effect to, every enactment of the General Assembly not obnoxious to constitutional prohibition. This proposition is advanced and upheld in Pennsylvania Co. v. State, 142 Ind., 428-434; St. Louis Dalles Improvement Co. v. Nelson Lumber Co., 43 Minn., 130-132; Lewis’ Sutherland Statutory Construction, Volume I, Section 86.”
Judge Price also cites with approval the Cochran case, supra, State, ex rel., v. Commissioners, supra, and Gordon v. State, supra. See also 26 Am. & Eng. Ency. Law (2 ed.), 656.
These eases are in no wise referred to in the majority opinion in this case.
Surely there is nothing uncertain, nothing ambiguous about the language “any lawful requirement,” where the statutory obligation is imposed upon the employer. If the statute is constitutional, the requirement is constitutional, and creates an obligation upon the employer upon which, if he fails. *75 the employe may predicate his action against him on the ground of negligence, granted and guaranteed by the constitution itself.
Consequences on This Judgment. The principle of causation is inherent in all natural law, and is intended to inhere in all civil law. Like begets like. Cause and effect are naturally and necessarily of like warp and woof. A just law will not be followed generally by unjust effects. A just judgment will not be followed generally by unjust consequences. What are the consequences of this judgment?
1. This court has usurped the power to amend the Constitution of Ohio, especially Section 35, Article II, under the mask of construction, reading into the constitution “specific and definite [enough] to advise an employer of his legal obligations.”
2. This court has placed Section 35, Article II, over and above Section 34, Article II, notwithstanding Section 34, Article II, concludes with these words, “and no other provision of the constitution shall impair or limit this power,” that is, the power of conservation by legislation.
3. This court has thus made compensation paramount to conservation, when by all the laws of nature, justice, and the clear intent of the constitutional provision, full conservation is placed paramount to what must of necessity be only partial compensation.
4. This court has violated almost every known rule of construction in arriving at this judgment. It has injected uncertainty of meaning into certainty nf meaning. It has said that the term “any lawful requirement,” which every layman understands to *76 at least include a valid statute, is not plain, but is so uncertain and indefinite that it must be construed by a court, and, after giving the constitution and the statute a hypodermic injection of doubt, the court proceeds, under the mask of construction, to place a limitation upon a grant of power that is unlimited and paramount.
5. This court has construed two sections, 34 and 35, of Article II of the Constitution, from the viewpoint of the employer, when they were made and adopted from the viewpoint and interest of the employe.
6. This court under pretext of safeguarding the compensation law of Ohio has so undermined the conservation law of Ohio that it has put both provisions in a hopeless state of confusion, and bred incalculable dissatisfaction among the working men and working women of Ohio, that will necessarily add fuel to the present unhappy state.
7. This court has done by mere dictum what it cannot accomplish by demonstration. It is an instance of “thus saith the court.” I hold that it should be “thus saith the constitution,” the constitution as it is, in plain phrase of the people, who said what they meant, and meant what they said.
8. This court unfortunately reflects the legal sentiment existing in the convention at the time of the adoption of these progressive amendments. I regret exceedingly that the representatives of the bar in the constitutional convention were against the. progressive amendments of that constitution, but that does not justify the profession in continuing to oppose these amendments.
*77 9. This court by this decision holds the most reactionary and at the same time revolutionary doctrine advanced in any decision of the last ten years. It has practically nullified all conservation statutes, which must of necessity by their very nature be made in general terms. You cannot deal specifically with all the varied machinery, appliances, and places of employment. General words alone, describing the degree of safety, are all that the situation and circumstances will permit. Yet, all such statutes are practically nullified by this decision. This court has held, and still holds, that the civil liability of ordinary care is sufficiently definite and certain to impose a liability upon the employer, which has been the rule of the common law in England and America from time immemorial, but now holds that when the statutes of Ohio, pursuant to the new, constitution, raise that degree of care to the extent of the language of the statutes of 1913, to the “highest practicable care,” the latter measure of duty is too indefinite, too uncertain, to constitute a lawful requirement.